---

THE OHIO.

(Circuit Court of Appeals, Sixth Circuit. November 9, 1898.)

No. 549.

1. COLLISION—DEFENSE OF INEVITABLE ACCIDENT.
    Where the cause of a collision was the sudden departure of a vessel from her course when about to meet and pass another, claimed to be due to inevitable accident, the burden rests upon her to show, not only that the initial sheer was due to such cause, but that she could not have overcome the effect of it by the exercise of reasonable care, caution, and maritime skill in her own management.[1]

2. SAME—DUTY OF OVERTAKING VESSEL.
    Under the navigation rules it is the duty of an overtaking vessel to pass at such a distance that her suction will not unreasonably interfere with the navigation of the one passed.

3. SAME — EVIDENCE OF IMPROPER MANAGEMENT — SUCTION OF OVERTAKING VESSEL.
    The steamship Mather overtook and passed the Siberia at a distance of from 40 to 75 feet in an open lake several miles wide and from 25 to 30 feet in depth. The vessels were of about equal dimensions and tonnage,

---

[1] For collision rules in general, see note to The Niagara, 28 C. C. A. 532, and The Mount Hope, 29 C. C. A. 368.

both heavily laden, and drawing about 15 feet of water. The Mather was going at a speed of 10 and the Siberia 9 miles an hour. As the Mather was drawing ahead, the Siberia drew towards her, the stern somewhat more than the bow, and, sheering from her course, continued on such deflected course for a diagonal distance of 800 or 1,000 feet, until she collided with and sunk the Ohio, a vessel going in the opposite direction, and which would have passed the Siberia, had the latter continued on her former course, at a distance of from 600 to 700 feet. *Held*, that while the initial sheer of the Siberia was probably due to the suction created by the Mather, for which the latter was in fault for having passed too close, such force was insufficient to account for the continuance of the Siberia on such deflected course for the distance traversed before striking the Ohio, had she been properly managed.

4. SAME—CONTRIBUTORY NEGLIGENCE—SUDDEN EMERGENCY.

Where two meeting vessels by signals agreed on the course on which they should pass, and one suddenly sheered from her course, and within from 40 to 60 seconds struck and sunk the other, the latter cannot be held in fault for not maneuvering in such unexpected emergency with the utmost promptness, skill, and accuracy of judgment.[2]

Cross Appeals from the District Court of the United States for the Eastern District of Michigan.

This is a collision case. The steamer Ohio, bound up Mud Lake, coal laden, and having in tow the schooner Sheldon, came into collision with the steamer Siberia, bound down Mud Lake, and was so injured as to almost immediately sink in 33 feet of water. The Siberia was the colliding vessel, and sustained but a slight injury. This collision occurred between the Can buoy and the entrance of the river St. Marys into Mud Lake. The Ohio sighted the propellers Siberia and Mather just as she was east of, and about abreast of, the Can buoy. The Siberia and Mather had just come out of the river St. Marys, and were distant from the Ohio about 2½ miles. At that time the Mather was some 400 feet in the wake of the Siberia, and both were about heading on the Can buoy. When distant about one-half mile from the Ohio, the latter indicated her intention to pass port to port by a passing signal of one blast. This was replied to by both with like signals of one blast. At that time these boats were about abreast, the Mather having overtaken the Siberia, and being in the act of passing on the latter's starboard hand. When these passing signals were exchanged the courses of the Siberia and Mather were nearly parallel, the Siberia being headed for the Can buoy and the Mather for a "lump" beyond that buoy, and slightly to the starboard thereof. They were then running very close together, the weight of evidence being that they were from 40 to 75 feet apart. At the same time the courses of the Ohio and Siberia were such as that, if each held its course, they would have passed each other at from 600 to 700 feet apart. The Mather was under a speed of about 10 miles per hour, and the Siberia at a speed of about 9 miles. The Mather, in a short time, gained on the Siberia so that she was about one-half of her length in advance of the latter. Just at this point, and when the distance diagonally between the Siberia and Ohio was from 800 to 1,000 feet, the Siberia departed from her course, and sheered suddenly to port, and within less than 60 seconds struck the Ohio on her port side, about 50 feet abaft of her stem, making a great hole, through which she filled, and rapidly sank. The libel filed by the Ohio charged faults against both the Siberia and Mather. The faults of the Siberia, thus charged, were: First, in not keeping a proper and sufficient lookout; second, in swinging to port and towards the propeller Ohio, and striking her, after passing signals of one blast had been exchanged; third, in not porting her wheel, and keeping the vessel to starboard, while approaching and attempting to pass the Ohio after the exchange of passing signals of one blast with her. The faults of the Mather were averred to be: First, in not keeping a proper and sufficient

---

[2] For signals of meeting vessels in general, see note to The New York, 30 C. C. A. 630.

lookout; second, in attempting to pass the steamship Siberia when the latter was just about to meet and pass the propeller Ohio; third, in not giving the Siberia sufficient room on the latter's starboard side to allow her to meet and pass the Ohio in safety; fourth, in drawing the Siberia out of her course, and causing her to sheer and strike the Ohio.

The answer of the Siberia set up the defense that the sheer which she took was wholly produced by the wrongful and negligent management of the Mather in overtaking and passing the Siberia so close as to produce suction, which threw the Siberia off on a sudden violent sheer; that this sheer and consequent collision were wholly beyond the control of the Siberia, although everything was done to break it, and recover her course, and avoid a collision, which it was in the power of the Siberia to do. No fault in the management of the Ohio was intimated in this answer. The answer of the Mather denies all fault in overtaking or passing the Siberia; denies that the Siberia's sheer was due to suction caused by the Mather's overtaking and passing her, but that her sheer was entirely due to the bad management of those in charge of her. This answer imputed no fault to the Ohio, but the record shows that during the trial of the cause the proctors of the Mather obtained leave to so amend the answer as to charge fault against the Ohio in not checking, stopping, and reversing so soon as the sheer of the Siberia began. This amendment is not found in the record, though it seems to have been treated as made by his honor, the district judge.

The court found: (1) That the Siberia was at fault in not reversing so soon as her sheer began, and that it was negligent to experiment with the helm before stopping and backing. (2) That the initial force which started this sheer was the suction of the Mather, which was at fault, as an overtaking vessel, in not passing the Siberia at a safe distance. (3) That the Ohio was negligent in not stopping and backing so soon as the sheer was discovered. The damages were divided equally between the three vessels. All parties have perfected appeals.

C. E. Kremer and John C. Shaw, for Lucius P. Mason.

Frank H. Canfield and H. D. Goulder, for the Siberia.

H. C. Wisner and James H. Hoyt, for the Mather.

Before TAFT and LURTON, Circuit Judges, and CLARK, District Judge.

LURTON, Circuit Judge, after making the foregoing facts, delivered the opinion of the court.

It is indisputable that the cause of this collision was the departure of the Siberia from the course she was on when about to pass the Ohio. An agreement to pass port to port had been established. If the Ohio and Siberia had each kept their then respective courses, they would have passed each other at a distance of 600 or 700 feet apart. This establishes a prima facie case of negligence against the Siberia, for this sudden change of course was the immediate cause of the collision. If this swing from her course was caused wholly by the wrongful approach of the Mather, and could not have been prevented or broken before the collision by the use of all the means which were reasonably within the control of those charged with her navigation, she must be acquitted, for the cause of the collision would be a cause not produced by her. But the burden is upon her to show, not only that her sheer was caused by the wrongful conduct of the Mather, but that her own management was such, both before and after the sheer, as not to have contributed to the final collision. The Olympia, 22 U. S. App. 69, 9 C. C. A. 393, and 61 Fed. 120.

The objection that the libel does not specify any mismanagement

other than a departure from her course is not well taken. The defense that her swing off of her course was due to the suction of the Mather must include evidence that that sheer was something which could not reasonably be avoided, and could not be broken by the exertion of all reasonable means within her power. As between the Siberia and the Ohio, the former's defense is that of inevitable accident. What was the cause of the Siberia's sheer? Was it wholly due to the suction of the Mather, as claimed by the owners of that propeller, or wholly due to her own bad steering, as claimed by the owners of the Mather? The Mather was the overtaking vessel, under rule 22, Rev. St. § 4233, and was bound to keep out of the way of the Siberia. This clearly required her to pass at such a distance as that the navigation of the Siberia should not be unreasonably interfered with as a result of her suction. The City of Brockton, 37 Fed. 897. The Mather was the overtaking vessel, and continued under the operation of the twenty-second rule until she should be finally past and clear. The Narragansett, 10 Blatchf. 475, Fed. Cas. No. 10,018.

The first question is whether the proximity of the Mather was the real cause of the sudden sheer of the Siberia. At the time that this sheer began, these two vessels were nearly abreast, the Mather being something near one-half her length in advance. The weight of evidence is that the distance between them when the Siberia sheered was between 40 and 75 feet. The stern of the Siberia seems to have been drawn towards the Mather. This necessarily threw her stem to port, and the swing to port began, which resulted in her collision with the Ohio, which was about to pass on her port hand. There was no great disparity in the length, or draft, or speed of these two vessels. The Siberia was loaded to a draft of 14 feet 10 inches. Her dimensions were 1,618.26 tons burden, 274 feet length, 38 feet beam, 18 feet depth, and she was loaded with 1,654 tons of iron ore. The Mather was loaded to a draft of 14 feet 8 inches. Her dimensions were 1,576.23 tons burden, 260 feet length, 40 feet beam, 19 feet depth, and loaded with 1,580 tons of iron ore. The speed of the Siberia was approximately 9 miles per hour, while that of the Mather was 10 miles per hour. There was nothing in the depth of the water or in the width of the channel calculated to disturb the navigation of either vessel. Mud Lake at this point was about 3 miles wide, with a depth of from 25 to 30 feet for from 100 to 300 feet on each side of the courses pursued by these passing vessels. In discussing the question of the effect of suction upon the navigation of the Siberia when passing the Mather, the district judge said:

"Here was no narrow channel or confined canal where these disturbances of vessels passing each other at speed is dangerous and disturbing beyond question, but an open lake, with water stretching miles in every direction, not as deep as the ocean, nor as vast, where the influence is the least felt, no doubt, but still water in at least seeming abundance. These vessels were each about the same size, large screw propellers, heavily laden with iron ore, drawing something less than 15 feet upon water averaging 25 or 30 feet in depth, and the speed of the passing vessel only one mile greater than the other. The Siberia was, if anything, larger than the Mather. Why should the Mather sheer her, and not she the Mather, or why did not things so nearly equal to each other neutralize this influence the one upon the other? No very satisfactory answer has been given to this, and the reply is that the subject

is little understood, but the seemingly small increase of speed—one mile an hour—is regarded as the fruitful difference."

That "suction" is a force to be reckoned with and guarded against when vessels pass in too close proximity is a fact which cannot be denied upon the evidence found in this record. To this force have been attributed many marine disasters. The Minnie, 31 Fed. 301; The City of Brockton, 37 Fed. 897. In other cases, suction, though present in some degree, has not been found the responsible cause of collision. The City of Cleveland, 56 Fed. 729; The Alex Folsom, 6 U. S. App. 153, 3 C. C. A. 165, and 52 Fed. 403; Standard Oil Co. v. The Garden City, 38 Fed. 860. The extent to which this force may be exerted depends primarily upon the proximity of the passing vessels, and secondarily upon their relative speed and size and character of the channel or water in which they pass. Here there was no great disparity in size or speed. Neither was there shoal water or a narrow channel to aggravate the effect of suction. The evidence seems to leave no reasonable doubt that when the effect of suction began to be noticeable these boats were within from 40 to 75 feet of each other, and that the stern of the Mather was about abreast of the fore rigging of the Siberia. At this point it is in evidence from both sides that the speed of the Siberia seemed to be increased, and that she ran up on the Mather some 10 or 15 feet. Yet it is uncontradicted that the steam of the Siberia was not increased. This temporary increase of speed by the slower boat is shown to be one of the effects of suction by which the slower boat is drawn along by suction, and thus the propelling power of her own machinery increased. It has been argued that, if suction had exerted any force upon the navigation of the Siberia, it would have shown its effect by attracting or drawing her closer to the vessel within whose influence she was, and not as a repulsing force throwing her off to port. But evidence of just such an attracting force appears. Capt. Ames, master of the Mather, says that, when passing the Siberia, and when nearly two-thirds his length ahead of her, the Siberia "started to come up on us, and closed in on us." When asked by counsel for the Mather, "What, in your judgment, was the cause of her drawing in on you, and sheering off to port?" he answered by saying, "Well, he may have got our suction, and, to avoid coming into us, he put his wheel to starboard, and held it too long,—so long that he could not get it back again,— put his rudder over to put him out of the way. Q. How would he put his helm to do that? A. He would starboard his helm,—starboard to keep her away from us." Asked what the Mather did when this drawing in of the Siberia was noticed, the same master said, "We continued straight ahead. Q. What could the Mather have done at that time, if anything, to have prevented the Siberia drawing into her and going off on that sheer? A. I don't think she could have done anything. Q. What could the Siberia have done to have prevented it? A. He could have had men enough there to handle his wheel, and straighten her up." This witness was asked to explain the operation of suction "between two boats of substantially the same draft of water, the same length, and same beam, moving through the water at relative speeds of nine and ten miles per hour." He answered,

"They will work back and forward, first one will go ahead a little ways, and then the other will go ahead; they will seesaw until they get apart far enough for one to get ahead." Asked as to the distance necessary for the exertion of suction, he said he "could not tell how far that did work." He furthermore said that he had never known the force to exert itself in such way as to turn the boat as the Siberia turned; that he had seen boats take sheers, "but they would soon straighten up." On cross-examination this witness made these statements: "Q. Did your suction have anything to do with his sheering? A. It might have pulled him up. Q. How pulled him up? A. It might have pulled him off toward us. Q. Don't you know that suction between vessels will force another vessel ahead? A. Yes, sir. Q. And it will do it about as it was done on this occasion? A. He started ahead in that way; yes. Q. Just about as suction would start a vessel ahead? A. Yes, sir. Q. Have you any doubt it was your suction that started him ahead, in your own mind? A. I don't know what he did. Q. Have you any doubt about it in your own mind? A. Well, yes. Q. You have doubt about it; still it was just as they do when they come up under the influence of suction? A. Yes, they do come up; but I don't know as I ever saw them come up as fast as he did. Q. How far were you away from the Siberia then? A. About 75 or 70 feet, somewheres along there, when he started to come in on us." This can but be regarded as a clear and distinct admission that the Siberia did come under the influence of the Mather's suction. That the Siberia was drawn closer to the Mather, her stern more than her bow, is one of the well-established facts of the case. It rests not only upon the evidence of the master of the Mather, which we have quoted, but upon that of the master of the Siberia, who, in substance, says that, though the Mather was the faster, and had steadily overtaken the Siberia, when the former was alongside, the Siberia gradually drew closer to the Mather, and took a "shoot ahead," gaining some 10 or 15 feet and then dropped back. The same witness also says that after this spurt he noticed that the stern of the Siberia was within 25 feet of the Mather, though her stem was from 50 to 65 feet off. The same thing is testified to as appearing to observers on the Ohio, and on the Majestic, a fourth steamer, near the scene, which passed up the lake on the starboard hand of the Mather while the latter and the Siberia were about abreast. If the stern of the Siberia was drawn thus towards the Mather, her stem must have been thrown in the opposite course,—to port. In that position her own headway would continue this porting, and produce the sheer observed by all the witnesses. That the suction of the Mather, as the faster and passing vessel, was the initial force which started the Siberia on this sheer, cannot be doubted upon the facts of this record. But it is almost incredible that there was not some active co-operation by wrong steering, or some equally blamable delay in adopting right means for controlling the sheer thus started. The difference in draft, length, and speed of these vessels was so slight, and the situation so favorable for controlling any tendency to sheer due alone to suction, or for recovering promptly when started, that we cannot suppress a strong suspicion that the management of the Siberia must have

contributed to the mischief which resulted to the Ohio. If this case were simply one between the Mather and Siberia for a collision between them, due primarily to the fault of the former, any reasonable doubt in regard to the management of the Siberia would be resolved in her favor. City of New York, 147 U. S. 72, 13 Sup. Ct. 211; The Oregon, 158 U. S. 197, 15 Sup. Ct. 804.

But the question we have here to decide is as to the liability of the Siberia to the Ohio, a vessel not originally responsible in any way for the deviation of the Siberia from her course. That liability must be determined upon very different principles. Was that deviation solely due to an agency not under her control? Was it without fault upon her part? Could it have been avoided by the exercise of ordinary vigilance and seamanship, or could the sheer, due originally to "suction," have been controlled, and her course recovered, by the exercise of reasonable and ordinary good seamanship? This much was certainly due to an innocent passing vessel; this much the Ohio had a right to expect from the Siberia. To exonerate herself from the prima facie case of negligence resulting from proof of her sudden deviation from her course, it is necessary that she shall show that that deviation was caused by an outside agency, and that the resulting collision was without fault upon her part. This was the doctrine upon which the case of The Merchant Prince, [1892] Prob. 179, proceeded, and is the doctrine upon which the case of The Olympia was decided by this court in 22 U. S. App. 69, 9 C. C. A. 393, and 61 Fed. 120. It may be conceded that the evidence makes it clear that the Siberia did come within the influence of the "suction" of the Mather, and it may be conceded, also, that no mere putting of her helm the wrong way would have caused so sudden and broad a sheer to port unless there had been also the co-operating force of "suction." But the Siberia does not exonerate herself from liability to the Ohio by simply showing that she thus came within the influence of the "suction" of a passing steamer. The Ohio has a right to call upon her to show that she was brought within this dangerous influence without fault, and that there was no fault in her management after this mysterious force began to exert itself upon her. Unless she can show that her deviation was due to a cause which she could not have reasonably avoided, how can it be said that the collision was inevitable; that it was not occasioned in any degree by the want of such care and skill as the law requires and holds all men bound to exercise? In the case of The Morning Light, 2 Wall. 550–561, the court said that "inevitable accident may be regarded as an occurrence which the party charged with the collision could not possibly prevent by the exercise of ordinary care, caution, and maritime skill." The learned district judge more than once, in the course of his full and able opinion, expressed the opinion that there was much exaggeration of the force and influence of the Mather's suction, and his inability to escape from a strong suspicion that bad management of the Siberia had co-operated in bringing about the collision. It is true that he finally rested his judgment against the Siberia upon the ground that she had not promptly stopped and reversed, instead of first experimenting with her rudder. That the learned judge did not rest his

judgment upon this as well as other grounds was due, as we think, to a misapprehension of the burden which rested upon the Siberia as between herself and the Ohio, a burden which required her to affirmatively establish that the collision was wholly without fault upon her part.

We do not disagree with the district court in holding that the Siberia was at fault in not stopping and backing when she checked. It is most probable that if she had then backed strong a collision would have been avoided. But we are not so sure that we should have agreed with this result if the Siberia had exonerated herself from all fault prior to that moment. We cannot feel that she has done this in any such satisfactory way as she is required to do under her defense of inevitable accident. The Siberia has not shifted the burden of proof and exonerated herself by showing that she came within the influence of the Mather's "suction." Was she brought within that influence without fault, and was there no fault in her management after that mysterious force had made itself apparent? "Suction" is not understood. That a faster vessel may cause a slower one to sheer by passing in the same direction in close proximity is as much as is shown with any degree of certainty by the expert evidence in this record. But all agree that the extent to which this force exerts itself in influencing the navigation depends upon the disparity in length, draft, and speed of the vessels, and is much aggravated or modified by the character of the water in which the one passes the other. So all substantially agree that a sheer started by suction is ordinarily quite manageable by the helm, and the influenced boat easily straightened out. The facts of this case were most favorable for checking any tendency to sheer and recovering by prompt use of the helm, if a sheer should be started. There was no shoal water nor shelving sides of a narrow channel to reflect waves of displacement. There were no currents or eddies, but an open lake, having a depth in the usual channel of from 25 to 30 feet, and a width of hundreds of feet. There was no great disparity in the size of these vessels, and the advantage in this particular was with the Siberia as the larger of the two. Neither was there any great difference in speed,—a difference of only one mile per hour. No reported case shows anything like the facts of this case. In the case of The Alex Folsom, 6 U. S. App. 153, 3 C. C. A. 165, and 52 Fed. 403, it was sought to hold the Folsom liable for the sheer of the Devereaux, as the faster vessel passing the Devereaux in a confined channel. The district judge had held the Folsom liable. This court reversed the judgment. The opinion was by Circuit Judge Jackson, and was concurred in by Mr. Justice-Brown. The court found the speed of the Devereaux to have been 4 miles, and that of the Folsom to have been 4½ miles. They passed within 60 feet, and in a channel, with shelving banks, about 200 feet wide. The observations of the court upon this subject of suction and its effect are in point, and we therefore quote from the opinion. Judge Jackson, in discussing suction, said:

"Under these conditions, is the libelants' theory that the sheer of the Devereaux and consequent collision were caused by 'suction' from the Folsom's passing at too great a speed established? We are clearly of the opinion that

It is not. When passing through the water, vessels in proportion to their size and speed produce or give rise to displacement waves, which run out quartering astern from their course, and affect smaller vessels within their reach. The cases are numerous in which larger vessels have been condemned for injuries caused to smaller vessels from such displacement waves. It is also shown by the testimony in this case that when vessels are passing each other in the same direction there is a tendency upon the part of the smaller vessel to be drawn out of her course and towards the track of the larger as the latter passes. In the case of The City of Cleveland, Mr. Justice Brown, then district judge, said that, if vessels are going in the same direction, and passing near each other, it [suction] has a very powerful effect to deflect the weaker vessel from her course, and that the suction of two vessels meeting and passing each other is not very powerful, its operation being too short to make any particular effect upon the action of the two vessels, 'unless one is much larger than the other.' The theory of suction in meeting and passing vessels is that the current, which rushes in astern to fill the displacement of water caused by the larger or more rapidly moving vessel, has a tendency to draw the other out of her course when her bow comes within its influence. When it is considered that such current has its direction in the line of the moving vessel, with its greatest force and strength directly astern, its lateral bearing as a drawing and diverting influence cannot, as suggested by Judge Brown, be very powerful. Whatever may be its force, it is clear from the testimony and from reasons that the smaller vessel is more liable to be affected by it. A relatively greater speed on the part of the smaller vessel may counteract such influence, and may even deflect to some extent the larger vessel, if her speed is sufficiently in excess. But no such fact is established in this case, and the opinion of witnesses, based upon hypothetical statements not supported by the weight of proof, amounts to practically nothing. That the Folsom, one hundred and eighty-five feet long, without cargo, with an average draft of seven feet, should have drawn or diverted the Devereaux, two hundred and seventy feet long, carrying a cargo, and with an average draft fore and aft of nearly fifteen feet, or more than double that of the Folsom, is in itself highly improbable; so much so that it would require the clearest proof to establish the proposition. The displacement of the Devereaux was nearly four times as great as that of the Folsom. When her bow passed, or was in the act of passing, the stern of the Folsom, she was drawing about four feet more of water than the Folsom's stern was displacing. This four feet of water was in no way affected by the Folsom's displacement, and, while it encompassed the bow of the Devereaux, it is difficult to understand how the latter could have been diverted from her course by the Folsom, even if the latter had been going six or seven miles an hour."

We cannot escape the conviction that there was mismanagement of the Siberia in addition to suction, and that both contributed to this disaster. While agreeing with the district judge that the master of the Siberia had a right to presume, when he saw the effort of the Mather to overtake and pass him, that she would not try to pass in such close proximity as to dangerously interfere with his navigation, and that until the Mather plainly indicated a purpose to make "a close shave" the Siberia was within her duty in keeping her course and speed. But so soon as the Mather came up on the starboard quarter of the Siberia a situation arose that required care and vigilance. Capt. Morse knew all that others knew about "suction." This he claims, and no more. The first effect of suction was in the spurt of speed taken by the Siberia, testified to by Capt. Morse, as well as others. Did he realize that this shooting ahead and dropping back was evidence that he was under the influence of suction? His boat began to draw into the Mather, her stern more than her bow. How soon did he realize what this meant? According to Capt. Morse, this

drawing in of his stern occurred when the bows of the Mather were abreast of the forward part of his cabin. After describing his spurt and gain on the Mather and his drop back, he proceeds by saying: "And she got along abreast of us, and when she got up I looked over my shoulder again, and her bows were somewhere abreast of the forward part of my cabin; and I looked over, and I thought her stern looked a good deal nearer than her bow." He proceeds with his account thus: "Well, she came along, and when she got a little past my vessel, she acted, I thought, as if she was swinging a little," and then, he says, he gave the order to port, etc. Now, here we have this shooting ahead and dropping back, followed by the drawing in of the stern of his boat, all before the stern of the Mather had passed the Siberia's bow, and yet her master seemed unconscious that he was under the influence of suction until the Mather had pushed along ahead, when he noticed his boat swinging; and then, and only then, did he give any order or take any step to guard against a danger, which should have been apparent so soon as the Mather came up on his starboard quarter in the close proximity testified to by all who witnessed this scene. He ought not to have been surprised at what happened. On cross-examination this was said: Q. By the Court: "When you first noticed the swinging of that vessel to port, had you seen the Mather then,—had you seen her creeping up on you? A. Yes, sir; I saw her when she was gaining on me. Q. Which did you see first, that the Mather had lapped over you, or did you swing first? A. I saw the Mather had got upon me before I saw the swing, —up abreast of me before I swung any,—along up her stem. Q. And you knew of the effect she would have on you? A. Yes, I knew. I supposed she would have an effect on me. Q. You expected she would swing you off to port when she came up, didn't you? A. Yes, if he didn't keep away from me. Q. You saw where she was then? A. Yes, sir. Q. Could she keep away from you then? A. Could she? Q. Yes, sir. A. She could not, unless she throwed her stern clear over into mine, and that would be just the same. All the way there would be, would be to check down, and let me go on my way. Then she would not have struck me; stayed behind a little." Aside from any question of active effort after it became apparent that the course of the Mather in passing was such as would likely involve danger, why was not his helm put to port when the first effect of suction ought to have been observed? The swing began slowly. Capt. Morse admits this. It afterwards became rapid. Is it not probable, at least, that an earlier port helm would have steadied his boat, and controlled this sheer? There is but one way to account for the delay in taking steps sooner, and that is upon the theory that the master of the Siberia was not at his post. The absence of any one on the upper deck of the Siberia while the Mather was passing was noticed by several of the Mather's people. They were in a position to see that deck, and they say that while they were passing no one was on deck forward save the wheelsman, and that the captain only appeared on top of the pilot house "about as the Siberia drew into the Mather." Capt. Morse admits that he only was on watch from the Encampment down, and that he did leave his post, and go to his cabin for

tobacco. He says he was gone for but a minute. That was, as it seems to us, a critical minute, for it was during the very time when the Mather was creeping alongside. It was, under the circumstances, negligent, and left the boat during such absence solely in the control of the wheelsman. That wheelsman is described by the district judge, who saw him, and heard his testimony, as "a not well-appearing man," and "a man likely in a moment of excitement to be demoralized." To attribute so broad and rapid a sheer as shown here to the influence of suction solely, would require most clear and cogent evidence that nothing done on the Siberia contributed thereto. Such evidence is not found. To put the helm at once hard a-port, and to hold it there, was demanded by every principle of navigation. Was this done? It is doubtful; more than doubtful. The wheelsman says he obeyed the order to port and to hard a-port. How did he do it? He says he rolled his wheel to port. This was the wrong way, and would have starboarded his helm. On re-examination he corrected himself, and said he rolled his wheel to starboard. Which way did he roll it? No one can tell. He made contradictory statements. Which must we believe? He made a miserable impression upon the district judge, who described him as a man easily demoralized, and likely in excitement to do the wrong thing. Yet this wheelsman brought out the fact, not theretofore shown, that the rudder was found jammed hard a-starboard after the collision. This the wheelsman accounts for in advance by saying that at the moment of collision the wheel was jerked out of his hands and rolled to port by the force of the collision. It may be. The wheelsman's evidence is not calculated to throw light. But it is said that the master saw the wheel turned to starboard, and his order properly executed. This he says he saw through a peep hole in the top of the pilot house. But against this is the evidence of Klasen, first assistant engineer of the Mather, who says that he saw the rudder of the Siberia, and it was to starboard. It is said that the rudder of this boat could not be seen by Klasen, but the evidence of Benham as to the dimensions of the rudder, and that the backing extended up about 4 feet above the 15-foot draught mark would indicate that one could tell, who was in a position to see the stern of the Siberia, whether the rudder was to port or starboard. This evidence is according to the probabilities. It is not probable that such a sheer could have been taken and persisted in until the Siberia, heavy laden as she was, could be projected across a diagonal distance of from 800 to 1,000 feet, and stopped only by collision with the Ohio. The fault of the Mather was in undertaking to pass the Siberia in dangerously close proximity, and this fault, we have no doubt, started the swing of the Siberia through suction. The Mather must, therefore, be condemned as having initiated the sheer which resulted so disastrously to the Ohio. But the Siberia must be also condemned. She has not satisfactorily shown that this sheer was wholly without fault upon her part, nor has she shown that the resulting collision was due to an agency wholly beyond her control.

This brings us to the question of the liability of the Ohio to contribute to her own loss. The district judge was of opinion that she was at fault for not stopping and backing so soon as the sheer of the

Siberia began. This obligation, he held, was imposed by rule 21, which requires that "every steam vessel, when approaching another vessel so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse." But the Ohio did not come under this rule until the sheer of the Siberia promised to become broad enough to put the Ohio in the category of a vessel "approaching another so as to involve risk of collision." The master of the Ohio held his speed and course until the checking and backing bells of the Siberia gave him notice that her sheer was uncontrollable. He then ported and checked. The court below said he should have acted sooner, and should have reversed when the sheer began, or, if not then, reversed when he checked. Under the circumstances of this case we should be slow to condemn anything done or omitted by the Ohio as a fault for which she should be condemned. The situation was one of surprise, and one to which she had not contributed. Within from 40 to 60 seconds after this sheer began the collision occurred. This gave little time to think, and less to act. That the captain of the Ohio did not at once realize the broad and dangerous character of this sheer, is not surprising. None like it in suddenness and persistence had been seen or known by any of the experienced seamen who testified in this case. It was natural to suppose, when it began, that the distance apart of the two vessels was such as that there was no risk of collision. That the master of the Ohio took a moment to think and observe, and to determine what course was best for him to take, is not ground upon which to condemn, even if the event proved that thereby time was lost in which something might have been done. That he ought to have reversed when he checked may, by the results, appear the wiser course. But it is also clear that reversal at that stage could not have prevented a collision. The expert evidence is that the way of the Ohio would have carried her not less than 400 feet before she would have commenced to back. The Siberia was within less than that distance when her own backing bells were heard. The situation did not admit of absolute cool consideration. The Ohio was placed in a situation of extreme danger by the wrongful deviation of the Siberia from her course. The rule is well settled that when one vessel by her own wrongful maneuver places another in a situation of immediate peril, and the latter does not act with that promptness and accuracy of judgment which might be expected when there was complete presence of mind, and happens to delay or do something, which turns out to have been a mistake, she will not thereby become such a contributor to the mischief as to render her liable for damages. The Maggie J. Smith, 123 U. S. 349–355, 8 Sup. Ct. 159; The Bywell Castle, 4 Prob. Div. 219. To quote the rule as stated in the case of The Bywell Castle, 4 Prob. Div. 219, and approved in the case of The Elizabeth Jones, 112 U. S. 514–526, 5 Sup. Ct. 468, and again in the case of The Maggie J. Smith, 123 U. S. 349–355, 8 Sup. Ct. 162: "Where one ship has, by wrong maneuvers, placed another ship in a position of extreme danger, that other ship will not be held to blame if she has done something wrong, and has not been maneuvered with perfect skill and presence of mind." We think this was the situation of the Ohio, and that the failure of her master

to instantly reverse, or his failure to reverse when he ported and checked, is not such a fault as to justify her condemnation. For this reason we must disagree with the district court, and reverse so much of the judgment as held the Ohio liable to contribute to the damages.

There remains the question of damages. The special commissioner to whom this question was referred reported the damages as aggregating $46,347.11. Upon an exception by the libelants, interest from the filing of the libel was added, and the report confirmed. Included in this aggregate of damages is an item of $7,879.20 for demurrage, being the probable net profits of a charter which the Ohio was prevented from performing by reason of the delay while undergoing repairs. This was excepted to by the owners of the Siberia and the Mather. This exception was overruled, and error has been assigned upon this ruling. This objection is based upon the theory that "the abandonment, having been accepted by the underwriters, and the loss having been paid by them, related back to the moment the collision occurred, and operated to transfer to the underwriters the complete title to the steamer as from that time." The original libel did aver a total loss. This was supposed to be so, as the Ohio, iron-laden, went down in 33 feet of water. The underwriters also supposed the loss total, and settled on that basis. Pending the suit she was raised by the underwriters, towed into a port, repaired, and sold. Upon this evidence the commissioner refused to allow damages as for a total loss, and held that libelants could only recover the whole actual loss. He therefore allowed the cost of raising her, of towing her to port, and of putting her in repair. He also allowed net profits of the pending voyage and probable net profits of an existing charter as profits prevented by the delay while undergoing repairs. The general rule is that, "in cases of a total loss by collision, damages are limited to the value of the vessel, with interest thereon, and the net freight profit pending at the time of the collision." The probable net profits of a charter may be considered in case of delay occasioned by a partial loss, when the question is as to the value of the use of the vessel pending repair. "In such case the net profits of a charter, which she would have performed except for the delay, may be treated as a basis for estimating the value of her use." The Umbria, 166 U. S. 404–421, 17 Sup. Ct. 617.

After the commissioner's report had been filed, and excepted to, the libelants amended their libel so as to state the facts concerning the loss, the subsequent raising and repair of the vessel, and their claim to be indemnified for the cost so expended, and for loss of probable profits of pending charter. They also amended so as to aver that their claim was to recover damages sustained by the owners of the steamer, her freight and charter, and as bailees of the cargo, and "as trustees for the underwriters and insurers on the said propeller and her cargo." It is said that this amendment was made without previous leave of the court. The record is silent as to this, but it does appear that the court treated it as properly filed, and made rulings accordingly. Aside from the technical question arising upon the libel as originally filed as to the effect upon a claim for demurrage of an abandonment and acceptance by the insurer, it is plain that the

appellants could not recover for a total loss, if, in fact, the loss was only partial. If limited to a recovery as for a partial loss, they would still be entitled to recover their whole loss, which would include cost of raising, repairing, net profits of pending voyage, and the value of the use of the vessel pending repairs. It was upon this basis that damages were assessed, and the appellants, the owners of the Siberia and Mather, have thus profited by the fact that the loss was partial, and not total. The amendment, so far as it set out the fact that the loss was not total, but partial, was possibly not necessary to permit a recovery of the partial loss under an averment that the loss had been total.

There remains the technical question as to whether the claim for demurrage had passed to the insurer as an effect of an abandonment to the underwriters, and an acceptance by them of such abandonment. We are inclined to the opinion that this abandonment was only for a constructive total loss, and should not have the effect of a sale, even though given effect by a formal assignment. The law would look deeper than mere appearances, and see the real fact lying at the bottom. But it is only necessary to suggest this, as we do not decide it. Whatever the effect of this technical abandonment upon this claim for demurrage, the difficulties were met when the libel was amended so as to show that the damages sought were such as had been sustained by both owners and underwriters, and that for the latter the suit was as trustees for the insurer. The underwriters were substituted to the claim of the owners against the wrongdoers for the partial loss actually sustained. This claim included demurrage. This action the underwriters might sustain in the name of the owners for their benefit, and so the owners may sustain such a suit as trustees for the insurer. It is not plain that it is necessary to aver that the suit is conducted for the benefit of the insurer, but any doubt was removed by the amendment of the libel. Hall v. Railroad Cos., 13 Wall. 367; Railway Co. v. Manchester Mills, 88 Tenn. 653–663, 14 S. W. 314. To award the whole damages to the libelants for themselves and as trustees for the insurers will not subject the appellants to the peril of a further suit, but will conclude the insurers.

Libelants filed an exception that the allowance for repairs was insufficient, and did not cover certain repairs made by the purchasers of the Ohio; and another, because the allowance for demurrage was insufficient. The commissioner regarded the proof as insufficient to sustain the contention covered by these exceptions. No such clear mistake of fact is shown as will justify the setting aside of the conclusions of the report. The Cayuga, 16 U. S. App. 577, 8 C. C. A. 188, and 59 Fed. 483.

The same rule must be applied to the remaining exceptions filed by the claimants of the Siberia and Mather. The report of Mr. Davison, the commissioner, who reported the damages, is a particularly clear and able one. Under the rule in the case of The Cayuga, supra, no sufficient reason has been shown for convicting the commissioner of any error of fact. The case must be reversed as to the Ohio, and remanded, with directions to enter a decree against the Siberia and Mather for all the damages and costs, including those of this appeal.