## THE BRANDON.

### (District Court, D. Maryland. October 26, 1916.)

COLLISION ⬬➣94—OVERTAKING VESSELS—FAULT OF OVERTAKING VESSEL.

A collision occurred in the daytime between the steamships Samarinda and Brandon, both passing out from the port of Baltimore loaded. The Samarinda was much the larger and the faster ship, and, gaining on the Brandon, which started first, signaled her intention to pass to port of the Brandon, which was assented to. When she was alongside, and perhaps 300 feet distant, the two vessels continued for two miles in that position. At a turn in the channel the Samarinda took a course converging on that of the Brandon and increased her speed. The latter, when she came nearer, stopped, and then went ahead at slow speed, but suddenly sheered, and struck the other vessel near the stern. Where the courses turned, the channel was wider, and the Samarinda could have given the Brandon more, instead of less, room. *Held* that, in failing to do so, she, as the overtaking vessel, assumed the risk, and was solely in fault for the collision, which was apparently due to suction; no fault being found in the navigation of the Brandon.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 197–199; Dec. Dig. ⬬➣94.]

In Admiralty. Suit for collision by C. W. Visser, master of the steamship Samarinda, against the steamship Brandon, with cross-libel. Decree for respondent on the cross-libel.

R. E. Lee Marshall, of Baltimore, Md., for libelant.

Edward E. Blodgett and Blodgett, Jones, Burnham & Bingham, all of Boston, Mass., for respondent.

ROSE, District Judge. At 4:25 on the afternoon of last Decoration Day two steamships came together in the Turn Channel, connecting the Brewerton with the Cut-Off Channel. The weather was clear. The ships had been in sight of each other during all the hour or more which had passed since they left the harbor of Baltimore, outward bound. The Brandon, the smaller of the two, was the first to leave her anchorage. · She is an American vessel, 244 feet long, with a beam of 43 feet, and a gross tonnage of 2,431. She was heavily laden with coal, and drew between 20 and 21 feet.

The Samarinda flies the Dutch flag. She is much larger than the Brandon. Her length over all is 449 feet, with a beam of 55 feet; her gross tonnage 6,825. She, too, had on board a full cargo, which in her case consisted of grain belonging to the Dutch government. Both ships were seriously injured, and the owner of the cargo of the Samarinda suffered loss and was put to expense. The Brandon was libeled, both by the master of the Samarinda and by the kingdom of the Netherlands. Her owners replied by a cross-libel against the Samarinda. The usual order of consolidation has been made.

The matters in controversy, although difficult and important, lie within a narrow compass. When the Brandon entered the Fort McHenry Channel, she was three-quarters of a mile or more ahead of the Samarinda. The latter is a faster ship, and as the engines of both

were running at full speed the Samarinda gained on the Brandon. By the time the former had passed the turn buoy marking the intersection of the Fort McHenry with the Brewerton Channel, she was not more than from a quarter to half a mile behind the latter. Naturally enough the speedier boat wanted to pass the slower, and when at the point last mentioned so signified by sounding two blasts. The Brandon assented by returning the signal. The Samarinda came up with the Brandon about opposite the entrance to the Sparrows Point Channel, which is slightly over a mile and a half from the point at which the Samarinda was when the signals were exchanged. If at the time of signaling the Brandon was only a quarter of a mile ahead, the Samarinda must have traveled a mile and a half while the Brandon went a mile and a quarter. In other words, their relative speeds must have been about 6 to 5. But after the Samarinda caught up to the Brandon, and began to run along opposite her, a curious thing happened. The engines of neither of the steamships were touched until shortly before the collision, and then those of the Samarinda were speeded up somewhat, and those of the Brandon first stopped all together, and then put slow ahead. Nevertheless, for two miles the two vessels remained side by side. Shortly before the collision, as a result of the speeding up of the Samarinda and the stopping and slowing down of the Brandon, the bow of the former began to draw ahead, and then, before her stern had gotten past the Brandon's stem, the collision took place.

None of the facts stated are in dispute. By the time the Brandon reached the point of collision, the Samarinda should have been two-fifths of a mile beyond her. Why was she not? While the two ships were running down the channel side by side, the American boat was toward the starboard, that is, the southern and western, side of the center line of the channel; the Dutch, on the port, or northern and eastern, side. Each says, and each doubtless believes, that it kept within from 40 to 75 feet, or thereabouts, of the buoys on its side. The distance between the buoy lines of the Brewerton Channel is 600 feet. If each of the ships was as close to the buoys on its own side as it thinks it was, the distance between them must have been between 350 and 400 feet. The witnesses for the Samarinda, however, say that the distance was only 300 feet, and the impression of some of those who testified for the Brandon is that it was even less. I do not think it was ever more than 300 feet, and there is some reason to suspect that it may have diminished even before the two vessels changed their courses in passing out of the Brewerton into the Turn Channel. One of the experienced navigators produced as an expert by the Samarinda testifies that when two ships move along side by side in a narrow channel, as the Samarinda and the Brandon did, the tendency is for them to draw closer to each other. However that may be, it is certain that before the collision the Samarinda did approach the Brandon. When opposite bouy 3B, the two vessels changed their courses in passing from the Brewerton Channel to the Turn Channel. The outward bound course of the Brewerton Channel is southeast by east five-eighths east. The line of the bouys on the southernmost and westernmost side of the Turn Channel runs southeast one-eighth south; that is to say,

the latter course is 1¾ points of the compass more southerly than the former.

When the Brandon came to the turning bouy 3B, she accordingly made this 1¾ point change of course. She could not make a greater, for she was already running close, perhaps within 50 feet, to the bouys on her side of the channel. The Samarinda, when opposite bouy 3B, began to change her course 2 points to the south, and, according to the estimate of her pilot, completed that change and steadied on her new course in the time in which she went 50 feet forward. As a result, the Samarinda ceased to move on a course parallel to that of the Brandon, but adopted one which, to the extent of one-quarter of a compass ·point, converged upon it. The effect of this amount of convergence in the distance between 3B and 1B, about opposite to· which latter point the collision took place, was necessarily to reduce the distance between the ships by 140 feet. If before the change took place they were as much as 300 feet apart, they would at the time of the collision, if nothing else had happened, have come within 160 feet of each other; and if the original distance separating them was only 200 feet, the new course would have brought them at the time of the collision within 60 feet of each other. Doubtless the 2 point change by the pilot of the Samarinda was the one usually there made. Under ordinary circumstances, it is a convenient one. An inspection of the chart will show that such change would bring the Samarinda to the entrance to the Cut-Off Channel on the starboard side of that channel, the proper position for her to take with reference to vessels which might be coming up inward bound. But the same inspection will show that there was no necessity to make such a change in course when it was made, for the buoy line on the northern and easternmost or Samarinda side of the Brewerton Channel extends more than half a mile beyond 3B to 14K, and there was plenty of room for the pilot of the Samarinda to keep entirely clear of the course of the Brandon. In view of the proximity of the latter vessel, the Samarinda had no right to put herself on a course which would necessarily converge upon that of the Brandon.

Of course, if the Samarinda drew ahead of the Brandon sufficiently to be clear of her before she came close enough in any wise to embarrass her navigation, no harm would result; but when the Samarinda chose unnecessarily to lay her course toward that of the Brandon, she, the overtaking vessel, assumed any risk which that maneuver might occasion. In view of the way in which the two vessels had kept side by side for two miles or more, the pilot of the Samarinda was not justified in assuming that before the two courses came close together he would be well ahead of the Brandon and out of her way. It is true that the Samarinda was the faster vessel, and he not unlikely knew that fact; but, if he did know it, he should also have appreciated that something out of the ordinary was happening, when the two ships had for so long kept side by side. The widening of the channel at the turn gave him an opportunity to break whatever force was keeping the two vessels together, by putting a greater distance between them. He decided to bring them closer together. Just about the time the

change of course was made the captain of the Samarinda had directed the engineer to speed up his engines, and two more revolutions were given to them. About the same time, probably a little later, those on the Brandon noticed that the course of the Samarinda was approaching theirs. They became somewhat apprehensive, and her master stopped the engines for one minute, and then went slow ahead, in order, as he explains, to keep control of his ship. As a result of speeding up on the Samarinda and of the stopping and slowing down of the Brandon, the Samarinda began to draw ahead. At the moment at which the thing happened which was the immediate cause of the collision, it is probable that about two-thirds of the length of the Samarinda, or say 300 feet of that ship, was forward of the stem of the Brandon.

Up to this point there is no special conflict in the testimony. Estimates of distances of course vary, but within quite moderate limits. Nor is there any controversy as to what next happened, although the cause of it is much disputed. The ships being in the relative position just stated, the bow of the Brandon was seen to turn in toward the Samarinda, and so sharply that she presently struck the Samarinda with her anchor and the bluff of her bow, about 68 feet forward of the Samarinda's stern. The turn the Brandon made was so sharp that the pilot on the bridge of the Samarinda as the vessels came together was able to see the Brandon's propeller along the starboard side of that ship. The sheer was one apparently of unusual suddenness and extent. What caused it? The Samarinda suggests two alternative answers. A number of its people claim to have seen the man at the wheel on the Brandon steering directly into the Samarinda. That might have happened; but it is highly improbable, and such an explanation is not to be accepted, unless it is clearly made out. Now, the trouble about accepting it at all is that the men who swear they saw it swear also to have seen much that they, by no possibility, could have seen. The best that can be said for them is that they have allowed their imagination to run far beyond their observation. They swear to have seen between one-half and one-third of the wheel, or 15 inches of the wheel, or a foot and a half of the wheel, 2 feet of the wheel, and so on, when the unquestioned and unquestionable fact is that, even if the vessels had been 442 feet apart, instead of probably less than 200, no part of the wheel proper, and only 2 inches of the upper part of its spokes, could possibly have been seen by any one of them. This explanation of the disaster may be definitely rejected.

The other contention advanced by the Samarinda to explain what took place is that the Brandon had an insufficient area of rudder, and in consequence steered badly, and was liable to get out of hand, and did so. The Brandon had originally been built for the lake trade. She was then equipped with a balanced rudder, the aggregate area of which was about 112 square feet. Since the outbreak of the European War, many lake vessels have been brought around to the coast. The Brandon was one of them. Her balanced rudder was then taken out, and she was equipped with a form of rudder generally used in

the ocean service. These changes were made under the direction of Mr. George Simpson, a naval architect of national reputation. The area of the new rudder was some 78 to 80 feet. Mr. Laverie, the chief surveyor to the Bureau Veritas, and Mr. Babcock, a consulting engineer and naval architect, testified that in their opinion the new rudder had not sufficient surface. There are standard tables, of one set of which Mr. Simpson is the author, which give rudder areas required for ships of various sizes, shapes, speeds, etc. The experts for the Samarinda do not attempt to say that the ocean rudder of the Brandon did not come up to these requirements. They say, however, that what is the necessary area of a rudder is, after all, a matter of experience and to some extent varies with each vessel; that, if the Brandon had 112 square feet of rudder on the lakes, it was presumably because it was there found she needed 112 square feet, and, in their view, she would need no less on the ocean. Mr. Simpson replies that the part of the balanced rudder forward of the stock is of little or no use in going ahead. Its purpose is to make the boat answer quickly when she is going astern, and there is little occasion for such a rudder in ocean work. Then there is testimony that, after the Brandon was equipped with her original ocean rudder, there was difficulty in steering her in heavy seas and strong tidal currents. There is no doubt that both she and her sister ship were very unsteady under such conditions. This made them uncomfortable, and in rough water reduced both their speed and their steering qualities. For the purpose of correcting these defects, their owners, by the advice of Mr. Simpson, last spring had them fitted with bilge keels, and a plate some 9 or 10 feet in area was added to the upper part of the rudder, so that it approached nearer the surface of the water.

In the position in which this addition was placed, the experts for the Samarinda say that under ordinary conditions it would have little or no effect in improving the steering qualities of the vessel. Mr. Simpson says that no improvement in those qualities in ordinary conditions was wanted. The purpose was to assist the bilge keels in keeping the ship steadier in heavy seas and strong currents, and by so doing to improve her steering qualities. The equipping of the Brandon with the bilge keels and the additional rudder piece took place a month or more before the collision. Since then she has been in very nearly continual service between Baltimore and Boston, and has made quite a number of voyages. She has docked and redocked in Baltimore, with tugs and without them, and alone and with tugs has, ladened and unladened, traversed channels only a hundred feet wide. She has repeatedly gone through the Cape Code Canal without assistance, and with one exception all the witnesses, who have testified from actual experience or observation of her since she was so equipped, say she has steered well—quite as well as ordinary ships. The man at the helm at the time of the collision says he had trouble in steering her down from Baltimore that afternoon, but he afterwards explained that all he meant was he had to watch her to keep her on her course. The contention of the experts for the Samarinda is that if she steered badly before the bilge keels were put on her, and the piece added to

her rudder she would continue to steer badly afterwards; but I think a sufficient answer to that contention is that there is no evidence that she did steer badly before those changes were made, except under conditions which did not exist in the smooth waters of the Patapsco river on a pleasant spring day, and that the changes which were made did tend to remove the cause which had led her to steer badly under other and more difficult circumstances. From the testimony I cannot find that any defect in the steering apparatus of the Brandon caused or contributed to the collision.

What explanation does the Brandon give of her change of course? She says that she was the victim of what the books call the force of suction, a name which, in the opinion of those believed to be expert in the phenomenon, does not describe with precise, accuracy what actually takes place. There does not seem to be any special difference among the theoretical experts, the practical seamen, and the reported cases that this force may manifest itself in various ways. When a larger vessel overtakes a smaller, the bow of the latter may be thrown violently away from the former, and necessarily her stern drawn closer. If this tendency fails to manifest itself, or, manifesting itself, is controlled, and the overtaking vessel comes up abeam of the overtaken, and they proceed on parallel courses, beam to beam, or nearly so, the overtaking vessel may accelerate the speed of the overtaken. For 20 years or more practical mariners have known that this sometimes takes place, and when it does they say one ship tows the other. The Ohio, 91 Fed. 551, 33 C. C. A. 667.

In this tendency must be found the explanation of how it was that these two ships of unequal speed kept together for the two miles or more from Sparrows Point to, or nearly to, the place of collision. And then sometimes, when the larger, faster, and overtaking vessel draws ahead, the bow of the smaller and overtaken vessel is drawn in toward its neighbor. It is only rarely that anything of this kind happens, and yet all agree that when it does happen, and when the movement once starts, it sometimes cannot be stopped at all, and, if it gets well under way, never can be stopped. Why it should manifest itself sometimes, and much more frequently should not, why it should exhibit itself so suddenly and irresistibly on some occasions as to defy all efforts to counteract it, and on others so slowly that it can be checked, nobody knows. The relative sizes, shapes, and speeds of vessels, the width of the channel, the conformation of the bottom, and other things have their influence. It is sufficient, however, for the purpose in hand, that the danger of the smaller and overtaken ship being rendered unmanageable by the movements of the larger, faster, and overtaking ship is a known one, the possibility of the happening of which the overtaking ship is bound not unnecessarily to increase. Perhaps it would be accurate to state its duty in still more onerous terms, but that question may remain unanswered until the occasion for its answer arises. In this case it is enough to say that, as has already been pointed out, the Samarinda came unnecessarily close to the Brandon, and was thereby in fault, and from that fault the collision followed.

The duty of the overtaken vessel is to keep her course and speed.

Some criticism has been made by the Samarinda of the action of the captain of the Brandon in first stopping and then going slowly ahead; but his critics are not at one as to what he should have done. One thinks he should have reversed; the other that he should have simply slowed down, and not have stopped. I am not prepared to find any fault in what he did, even if it is possible, as is not shown, that something else might have turned out better. The other vessel was crowding down on him. It had created the difficulty. The master of the Brandon was forced by the Samarinda to take some measures of precaution. The testimony does not satisfy me that those he took were not such as would commend themselves to a capable and experienced mariner under the circumstances in which he found himself, and, moreover, I think it most unlikely that what he did in any wise contributed to the collision which followed shortly thereafter.

It follows that the libels against the Brandon must be dismissed, and that of its owners against the Samarinda sustained. The Brandon may have a reference to ascertain its damages, if they cannot be otherwise determined.