### THE AUSTRALIA.

(Circuit Court of Appeals, Sixth Circuit. February 3, 1903.)

#### No. 1,084.

1. COLLISION—BARGES IN TOW MEETING—BURDEN OF PROOF.

Where a collision between two barges in tow meeting in a channel was caused by the sheering of one past the middle of the channel, the burden rests upon her, in order to avoid liability, to show that such sheer was the result of inevitable accident or some force which she could not guard against by that reasonable degree of skill required of a navigator in the waters where it occurred.

2. SAME.

A barge while being towed up through St. Mary's river, and while passing another barge in tow coming down, in a channel or cut 300 feet wide, under a passing signal, sheered first into the bank on the starboard side, and then in the opposite direction across the middle of the channel, and came in collision with the other barge, which was well to the west side of the channel. Held, that the fact that there was a cross-current at the point where the first sheer took place did not exonerate her from liability, the existence of such current being well known, and its effect such that it could be overcome by proper care and skill in navigation.

Appeal from the District Court of the United States for the Northern District of Ohio.

The barge Maida, bound down the river Ste. Marie in tow of the steamer Marina, came into collision with the barge Australia, bound up the river, in tow of the steamer Italia, the Maida receiving considerable damage. The collision occurred on a bright afternoon in May, 1898, in that part of the river known as the "Little Rapids Cut." That cut is an artificial channel 300 feet wide, between navigable banks. There is a current through this cut of about four miles. There is a cross-current setting around the foot of Island No. 1, on each side of the cut, which comes into the cut at an angle down stream of about 45 degrees. The force of this cross-current is variable, dependent on direction and force of the wind on Lake Superior. When some distance apart, passing signals of one blast were exchanged between the two towing steamers. About as the bow of the Australia reached the lower end.

of the island referred to, she took a sheer to starboard, and persisted in it until she struck the right-hand bank just above the foot of the island, and then sheered to port. A collision with the Marina was narrowly avoided, and one actually occurred with the Maida before the sheer to port was broken, or just about as she had begun to swing to starboard, though still pointed somewhat toward the westerly bank. The collision was almost head on, the starboard bow of the Australia striking the starboard bow of the Maida. Judge Ricks, after hearing a great mass of evidence, held that the Australia was in fault, and acquitted the Italia, as well as the libelant's two vessels, of all contributory fault. The Australia only has appealed.

John C. Shaw, for appellant.

Herman A. Kelley, for appellee.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

Within a proper distance the two steamers agreed to pass port to port. The navigable channel was 300 feet wide. The day was clear. There ought to have been no difficulty in these two tows passing each other if properly equipped and navigated. That the two barges should, under such circumstances, come into collision, strongly indicates that there was negligence in the navigation of one or both. Both barges were under obligation to follow in the wake of their steamers. The steamers did pass port to port in safety. The barges were both unusually long, the Maida 391 feet and the Australia 390 feet. Both were laden. Each was on a towline of about 500 feet. The passing agreement bound the Australia to keep on the right-hand or eastern side of the cut, while the Maida was equally bound to keep on the western side Confessedly the Australia took a sheer when about opposite the foot of Island No. 1. This sheer was not controlled, according to her answer and the evidence of her master, until she struck the bank just above the foot of the island. She then took another sheer to port. There is a great deal of conflict in the evidence as to the extent of this sheer to port. The master of the Australia makes little of it, and testifies that he recovered and straightened up just about mid-channel, and contends that if the Maida had directed her course to the starboard, as she was bound to do under the passing signals, there would have been no collision, as he claims the collision occurred in, or just about, the middle of the channel. The other officers and the crew of the Australia and the officers and crew of the steamer Italia substantially concur in putting the collision in the middle of the cut. The people on the Maida and her steamer, the Marina, unite in putting both the Marina and her barge close in to the western shore at the moment of the collision. Certain shore witnesses were also heard, but they, too, differed as to the location of the collision. The probabilities are that the Marina and her barge did direct their course to starboard as they had agreed to do, and that they were over on the westerly side of the channel when the collision occurred. This probability is strongly confirmed by certain evidence now to be mentioned.

It is in evidence and undisputed that, at the very instant when the stems of the two schooners came into collision, the Maida dropped her

kedge anchor over. That anchor was found and picked up from the bottom of the channel the next day. It was found at a point about 98 feet from the visible west bank of the cut, or about 62 feet from the west channel bank. Now this kedge anchor was kept on the port side, about halfway between the keel and the side. The heads and flukes of a patent anchor belonging to the Australia were also broken off short at the starboard hawse pipe at the time of the collision. The bows of the two colliding vessels remained locked together for a moment after the collision, swinging, while so locked, a little to the eastward and slowly downstream. The theory of the appellee is that the broken anchor head and flukes must have dropped to the bottom just as the two vessels separated. In confirmation it is shown that in February, 1899, divers went down and located these broken parts at a point 62 feet west of the mid-channel, and at such a point downstream as tends to support the theory that these broken parts had not been dropped until the stems of the colliding vessels separated.

Without entering into an argument, we are convinced, upon all the evidence, that the collision occurred quite over on the western side of the channel, and about as claimed by the appellees. This was the conclusion of Judge Ricks, and we see every reason to concur in his opinion on this question of fact. We have, then, a case of where a collision is shown to have occurred which certainly would not have occurred if the Australia had kept upon the eastern side of the channel, as she was bound to do. What is her excuse? She says she was sheered by the effect of a cross-current which is felt at the lower end of Island No. 1. But this was a well-known condition of navigation, and vessels properly equipped and properly navigated are not materially affected by the current. But if the sheer which carried her to starboard was without fault, how did it happen that it was not broken before striking the right bank, and how did it happen that she should then take so wide a sheer in the other direction as to get on the other side of the channel and across the bow of the Marina coming down? The presumptions are very strongly against her proper navigation. It is not upon the libelant to show that the Australia's sheer was originally due to any specific fault of equipment or navigation, or that it might have been sooner broken, or that the second sheer was the result of some affirmative fault. Her sudden departure from her course, her failure to keep the side of the channel which she was bound to keep, were very plain violations of her duty to the down tow. To say that her erratic course in bounding backward and forward across the channel was due to a sheer is no defense, unless she can show that that sheer was unavoidable; that is, that the cause which started the sheer and maintained it was a force which she could not resist or guard against by that reasonable degree of skill required from a navigator in the waters where this sheer occurred. This is the doctrine of The Louisiana, 3 Wall. 164, 173, 18 L. Ed. 85; The Olympia, 9 C. C. A. 393, 61 Fed. 120; The Ohio, 33 C. C. A. 667, 91 Fed. 547; The F. W. Wheeler, 24 C. C. A. 353, 78 Fed. 824; The Centurion, 40 C. C. A. 634, 100 Fed. 663; and of The Fontana (decided in January last by this court) 119 Fed. 853; Mars. Coll. 38. In The Louisiana, the court said:

"The collision being caused by the Louisiana drifting from her moorings, she must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident, or a vis major, which human skill and precaution, and a proper display of nautical skill, could not have prevented."

Has the Australia accounted for her conduct? The existence of the cross-current was a well-known factor in the navigation of the river at this point. Her master says he never knew a barge to sheer in and strike the east bank as she did. He says when he first struck the current he ported; that he was then about mid-channel; that this porting took him "up against the east bank, as she kept going in that direction." He adds: "After I got headed up with the current I steadied her and tried to overcome it, but she kept about on that same angle until she struck the bank." He claims to have put his helm hard astarboard so soon as he got to the eastward of mid-channel under his port helm. His explanation of her sheer, to quote his own words, is "that there was a little stronger current than usual, and that as she approached up there she got the pressure of the current against her more than usual, and that length [sic] of the boat held her off." Now, he knew all of the conditions or ought to have known them. The fact that the current was a "little stronger than usual" was a fact to be anticipated, the wind being north or northwest, as the current was somewhat affected by such a wind driving the water of Lake Superior more strongly into the river. We cannot escape the conviction that the helm was put too far to port or held over too long. It certainly was held there in such manner as to catch the strong down current on her port bow and carry her over against the eastern bank, in spite of the fact that her helm was put to starboard so soon as this effect of the current was observed. To further show his own defense, we quote two questions and answers from his cross-examination:

"Q. There were no conditions then that were unknown to you? A. No; not apparently. Q. And with the conditions known to you, you put your helm to port enough, as you supposed, to overcome that cross current; but in spite of that you were not able to catch her on starboard wheel in time to prevent her from going into the bank; that is the way that happened, wasn't it? A. Yes, sir; that is it."

The extent of the second sheer is unexplainable. She struck the bank with her bow some 300 or 400 feet above the lower point of the island around which the disturbing current had come. She was then above and beyond its influence. Her bow, he says, "glanced off, and her stern came along the bank so that she straightened up along the bank." He further says that as soon as she stopped sheering he steadied his wheel, which had last been hard astarboard, and put it hard aport, and that the wheel was kept hard aport until the collision. Under this wheel he claims that she "worked up the bank about half her length," or 200 feet, and then began swinging off to port or the westward side of the channel. His contention is that he did not take anything like a broad sheer, and was never headed more than one point towards the center of the channel, and that she straightened out head up stream just about mid-channel. But the probabilities and the weight of the evidence contradict him upon this point, for the collision

occurred considerably west of mid-channel. That the collision was head on, or nearly so, shows that she had then broken her sheer and was about headed up stream. But she was then within about 50 feet of the western bank of the channel. The sheer to port was therefore much longer persisted in than would seem from this witness' evidence. We have referred to Capt. Marsden of the Australia because his evidence is substantially that of the other officers and crew of the Australia and Italia. We see no reason to find that the Italia was responsible for either the sheer or its persistence. She seems to have done all she could to break it, and in no fault for its starting.

Neither do we think the Marina or the Maida are to be condemned as contributing. We are satisfied that both directed their course to the westward side, and that, when the sheer of the Australia was observed, they went as far over as was safe, and that the Maida was probably within 50 feet of the western channel bank when the collision occurred.

As to the maneuvers of these boats after the sheer commenced we need say little. The very erratic course of the Australia is adequate cause in itself to account for the disaster. Her effort to impugn the management of either the Marina or her barges as contributing should be made very clearly to appear, her own fault being so glaring and sufficient. The Oregon, 158 U. S. 187, 15 Sup. Ct. 804, 39 L. Ed. 943; The City of New York, 147 U. S. 72, 13 Sup. Ct. 211, 37 L. Ed. 84. The Australia has not made out her defense. The master knew the conditions and the dangers incident to the cross-current he would meet at the foot of Island No. 1, and he knew he would have to pass a descending tow with whom he had already made a passing agreement. He voluntarily put himself in a position where he was obliged to receive the natural effect of that current. He should have foreseen and anticipated the possibility that it might be somewhat stronger than usual, as he knew it was a current of variable force. He has not shown that the conditions were such that he could not avoid the sheer he took. Upon the contrary, the exercise of that degree of skill and maritime caution required under such circumstances would undoubtedly have prevented this accident.

The decree must in all things be affirmed.