MINNESOTA S. S. CO. v. LEHIGH VALLEY TRANSPORTATION CO. et al.

LEHIGH VALLEY TRANSPORTATION CO. v. MINNESOTA S. S. CO. et al.

(Circuit Court of Appeals, Sixth Circuit. March 22, 1904.)

Nos. 1,229, 1,230.

1. COLLISION—SUDDEN SHEERING OF VESSEL—BURDEN OF PROOF.

A vessel which suddenly sheers from her proper course in ordinary weather, in a fairly ample space for navigation, and under no apparent stress of circumstances occurring without her fault, and, in consequence of such sheering, comes into collision with another vessel, is presumptively in fault for the collision, and has the burden of exonerating herself.

2. SAME—STEAM VESSELS MEETING—PROCEEDING ABREAST IN CHANNEL.

The steamer Mariposa, with the barge Martha in tow on a line 600 feet long, both heavily laden with iron ore, was coming down the dredged channel through Lake St. Clair in the evening at a speed of about 7 miles; the channel being 800 feet wide. When near the south end of the cut, signals for passing port to port were exchanged between the Mariposa and the steamers Troy and Wilbur, which were coming up lightly laden, and were then just below the bend at the entrance to the channel, and about three-fourths of a mile away. The two steamers came on abreast the Troy on the starboard side, and the Wilbur about 40 feet away, at a

speed of 13 miles or more, and passed the Mariposa safely, but about that time the Wilbur took a sudden sheer to port, and struck and sunk the Martha. The weight of testimony tended to show that when the signals were exchanged the Mariposa was about on the range line in the middle of the channel; that she then ported, and, on seeing that the two meeting steamers were abreast, ported again, the Martha following each time, and that at the time of collision they were each about 150 feet to the westward of the center of the channel; also that the Wilbur passed the Mariposa at a distance of about 50 feet, and was at no time east of the range line. She called to the Troy to stand off and give more room, which being refused, she slackened speed just before meeting the Mariposa, which brought her stern within the suction at the stern of the Troy, and caused the sheer. *Held*, that neither the Mariposa nor the Martha was in fault, it appearing that the latter ported again on seeing the Wilbur sheer, but could not then get out of the way, but that the collision was due to the fault of the Wilbur and the Troy, for coming up abreast, as they did, so near the center of the channel; the Troy also being in fault for unnecessarily crowding the Wilbur toward the meeting vessels.

3. ADMIRALTY—TRIAL—EXCLUSION OF EVIDENCE.
    In the trial of an admiralty cause, where the testimony is taken before the court, all testimony offered, although objected to, should be admitted, subject to the objection for the benefit of the appellate court, unless so utterly irrelevant or immaterial that there can be no question of its inadmissibility.

Appeal from the District Court of the United States for the Eastern District of Michigan.

These are appeals from a decree of the district court, in admiralty, rendered in a cause of collision between the steamer E. P. Wilbur and the barge Martha on the evening of October 26, 1900, near the lower end of Lake St. Clair, and in a channel or cut extending from a point not far above the place where the waters of the lake pass down into the Detroit river, upward through the shoal water of the lake for several miles. The channel is straight, is 20 feet deep, and of the width of 800 feet. The Peche Island Range, running through its center, makes a course about two points to the left of the last course below on which vessels come up out of the Detroit river. The western side of the channel is marked by white lights a mile and a half or more apart. On the eastern side are red lights opposite to the others, and, of course, the same distance apart.

The steamer Mariposa, with the Martha in tow, on a line 600 feet long, both laden with iron ore, was coming down the channel on her way to Lake Erie ports. The Wilbur was going up, lightly laden, and was moving alongside the steamer Troy, also going up, lightly laden; the Wilbur being on the port side of the Troy. Signals were exchanged between the Mariposa and the Wilbur and the Troy in due season, while the two latter were below the cut, and nearly three-quarters of a mile distant from the Mariposa, signifying an agreement to pass on the port hand. The Mariposa was moving at a speed of about 7 miles an hour, and the up-bound steamers at a speed of 13 miles, or a little more. The Wilbur and the Troy passed the Mariposa at a safe distance and without trouble, but at that time the Wilbur took a sudden sheer to port, and, striking the Martha on the bluff of her bow, broke into that vessel for a distance of 26 feet, and beyond her collision bulkhead. The bow of the Martha immediately filled with water and sank to the bottom. The after part of the vessel floated for a brief time, and then went down. The damage from the collision to the Martha amounted to $43,000 and over, and the Wilbur sustained damage to the amount of over $15,000. The collision occurred about half past 9 o'clock, a half mile above the lights at the lower end of the cut. The night was somewhat dark, though the weather was clear and calm. There is a current in the cut of about a mile an hour. The Mariposa was 330 feet long. Her breadth of beam was 45 feet, and her draught 17 feet. The Martha's length was 352 feet, her breadth was 44 feet, and her draught 17 feet and 6 inches. The Wilbur was 290 feet long, 40 feet beam, and 14½ feet

draught. The Troy was 402 feet long, 45 feet beam, and had a draught of 14 feet. More particular details of many of the principal facts are stated in the opinion, which follows.

The owner of the Martha, the Minnesota Steamship Company, libeled the Wilbur and the Troy for her damage; alleging that the misconduct of the latter contributed to the sheer of the Wilbur, whereby the mischief was done. The Lehigh Valley Transportation Company, claimants of the Wilbur, answered for that vessel, denying all fault, and, by cross-libel and petition, charged the Troy, the Mariposa, and the Martha with responsibility for the damages suffered by the Wilbur. The Western Transit Company, claimants of the Troy, answered, denying all fault, and by petition brought in all the other vessels; charging them with various faults, and praying that they be charged with the damages ensuing in exoneration of the Troy. Answers to the cross-libel and petitions having been filed, and testimony taken, the parties were heard thereon. By the decree the Wilbur and the Mariposa were condemned, and each decreed to pay one-half of the whole damage. The Troy and the Martha were exonerated. The Minnesota Steamship Company and the Lehigh Valley Transportation Company have severally appealed.

Hermon A. Kelley (Hoyt, Dustin & Kelley, of counsel), for appellant Minnesota S. S. Co.

John C. Shaw (Martin Carey and Shaw, Warren, Cady & Oakes, of counsel), for appellant Lehigh Valley Transportation Co.

Harvey D. Goulder (S. H. Holding and F. S. Masten, of counsel), for appellee Western Transit Co.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge, having made the preceding statement, delivered the opinion of the court.

The outline of the controversy, as above shown, indicates that we should first consider the case of the Wilbur, whose sudden departure from her course was the immediate cause of the disaster. Having regard to the general facts already stated, without more, a presumption of fault on the part of that vessel arises, which she takes the burden of dispelling. She is bound to explain how it was that, in ordinary weather, in a fairly ample space for navigation, and being under no stress of circumstances occurring without her fault, she should have been suffered to go off on so dangerous a course. The Olympia, 61 Fed. 120, 9 C. C. A. 393; The F. W. Wheeler, 78 Fed. 824, 24 C. C. A. 353; The Mitchell Transportation Co. v. Green, 120 Fed. 49, 60, 56 C. C. A. 455; Davidson v. American Steel Barge Co., 120 Fed. 250, 56 C. C. A. 86; The Australia, 120 Fed. 220, 222, 224, 56 C. C. A. 568.

She has endeavored to explain, by charging that her sheer was produced by the improper conduct of the Troy and the Mariposa, in that those vessels wrongfully and unlawfully maintained a course so close to her, on either hand, that she could not control her own movements, and was powerless to avoid the disaster to which those vessels impelled her. But her answer gives color for a belief which is abundantly confirmed by the testimony that the Wilbur and Troy had been coming up the river ever since they left Detroit, eight miles below, at a rapid gait abreast of each other, "neck and neck," as one of the officers of the Troy expresses it in his testimony, apparently struggling for precedence. It appears that, when the vessels arrived at Detroit, the Wilbur was ahead, but that she stopped or slackened speed there momentarily, to pick up the mailboat, and the Troy got by her, or nearly by her, before

she got under full speed again. At all events, she drew up alongside of the Troy, and the vessels maintained that position, at varying distances apart, going up the river at a pace so rapid as to attract the attention and remark of those they passed, and exciting apprehension of danger to other craft which they met or passed. The court below was complaisant enough to accept the statement of the officers of the Wilbur and the Troy that they were not racing. But it matters little by what expression their conduct is characterized. We are convinced that the purpose of those on each of the steamers was that the other should not be allowed to get ahead of her, and that they were more intent on that purpose than to observe the habits of prudent navigation of their ships. The officers of the Wilbur say that she came around for the entrance of the cut only a few feet—30 to 50—from the lower white light on the west side, and the Troy was about the same or a little further distance off on the starboard hand of the Wilbur. We are not prepared to say that, if these vessels had been proceeding separately, their speed was improper; and there is no reason to suppose in the present instance that, if the vessels had come up singly, the disaster would have occurred. But they had no sufficient reason for supposing that those coming down would know that they were coming up in that form, and would make preparation to give them a wide berth. The danger of sudden sheers from passing other vessels, especially when going at great speed, is well understood; and the danger is increased when two vessels are moving in the same direction, close to each other, but at varying speed, so that the stern of the one is liable to fall into the trough behind the other. The result in this instance is one of which there was risk. A prudent navigator would have taken account of it. A giddy one, intent on a contest of speed, might not. The captain of the Wilbur testifies that he was conscious of the risk; that he did not like to have the Troy so near him; that he felt uncomfortable; that he checked twice to permit the Troy to go ahead before they entered the channel, but that she did not, and came up into the cut not more than 100 feet away from the Wilbur. But he also says that there would have been no difficulty in checking the Wilbur to the extent necessary in order to follow the Troy, and it is manifest this was so.

When the captain of the Wilbur testifies, as he does, that his sense of the danger he was in became so great after the two steamers rounded to, and were about to meet the down-bound vessels, that he checked his own vessel, and that she immediately began to sheer, and he was unable thereafter to stop her until the collision happened, the immediate cause of the disaster becomes clear. The Troy was considerably larger than the Wilbur. The sterns of the vessels were opposite. The stem of the Troy was 100 feet in advance of that of the Wilbur, and the two vessels were on parallel lines, and about 40 feet apart. When the Wilbur checked, her stern was sucked into the wake of the Troy by the inflowing waters at the stern of the latter; and this influence, combined with the impact of the water displaced by the bow of the Troy upon the forward starboard side of the Wilbur, and the high speed at which the vessels were moving, would naturally effect the uncontrollable sheer which the captain of the Wilbur says his vessel experienced. As the speed of the vessels was still nearly alike, these

influences were not momentary, but were sustained for a time. It is contended on the part of the Wilbur and the Troy that the Mariposa produced, or at least contributed to produce, the sheer of the Wilbur. But that vessel, by the account of the Wilbur herself, was nearly twice as far away from her as the Troy. Besides, she was a meeting vessel, and in·such case her influence was only momentary; and, her speed being moderate, the suction at her stem could not have been great—not greater than would be frequently experienced in ordinary navigation.

The influences which operated here, and which are so constantly observed by intelligent seamen, were discussed and in great measure explained by this court in the case of The Alexander Folsom, 52 Fed. 403, 3 C. C. A. 165. And in several cases since we have had .occasion to observe their decisive effect in contributing to disastrous collisions. The Ohio, 91 Fed. 547, 33 C. C. A. 667; The Fontana, 119 Fed. 853, 56 C. C. A. 365; The Australia, 120 Fed. 220, 56 C. C. A. 568.

When the steamers came around into the channel, they knew what the position of the Mariposa and her tow was. If there was danger, they could see it. They were three-quarters of a mile off. But they at no time gave any signal to the Mariposa of apprehended danger. For reasons which we shall state hereafter, we are convinced that the Mariposa and the Martha were for some distance, before they met the up-bound steamers, on the western side of the middle of the fairway or dredged channel. It is certain, and it is the one thing about which there is no dispute, that the Wilbur and the Troy were advancing abreast and very close to each other—not more than 40 feet apart. Those on the Wilbur called to the Troy to stand off and give the Wilbur more room, or to check her speed. This request was met by an obstinate refusal. The Troy justifies herself by the allegation that· she was already well over to the eastern side of the channel, and could not prudently give more room. Moreover, the captain of the Troy testifies that there was ample distance between the Troy and the Mariposa and her tow to allow the Wilbur free passage by, with proper management. And here we stop to notice the attitude of the Troy and her testimony in making her defense. Her officers are responsible for the story that, at the time the Wilbur sheered off, the Troy was about 40 to 50 feet from the eastern side of the channel; that the Wilbur was abreast of her (that is, their sterns were opposite each other); that the Mariposa was on a course 250 feet westward of the Troy. This would bring the Mariposa considerably east of midchannel. We think this testimony savors of a self-serving purpose, and, in respect to the Troy's position in the channel, it is so opposed to the weight of the testimony, and the probabilities arising from facts which we feel quite sure of, that we are constrained to regard it as unreliable. We refuse to believe that the Troy was where she says she was, and are convinced that the complaint of the Wilbur that during the critical period the Troy wrongfully crowded her too far over to the westward is well founded. As will be shown later on, sufficient reasons appear for believing that the collision occurred quite to the westward of the middle of the channel, and at a place where the Wilbur had no right to be; and, further, that she has not excused herself for·being there. We

think the Wilbur was at fault in not taking counsel of her fear, and in going up alongside of the Troy at the speed they were moving—a menace to meeting vessels.  We do not say that of itself her checking her speed in extremis was an actionable fault.  But she voluntarily placed herself in a position where she was liable to be in extremity.  She cannot, therefore, plead the peril she came into as an excuse.  The Australia, supra; 7 Cyc. 309.

From the necessity of the case, we have been obliged, in discussing the conduct of the Wilbur, to deal with the conduct of the Troy also. We think she shared in the fault of the Wilbur in going up the channel in the relation with her that she held, and at the speed they maintained, and that she unnecessarily crowded the Wilbur into too close proximity with the course of the Mariposa and the Martha— whether from perversity or recklessness, we do not say—and refused to give room, when she had ample opportunity for doing so without danger to herself, when she knew of the straits the Wilbur was in. Her fault was even greater than the Wilbur when the final catastrophe was brought on.

When we say the Troy crowded the Wilbur into too close proximity with the Mariposa and the Martha, we have in mind the speed of the Troy and the Wilbur, and their relation to each other.

Counsel for both the Wilbur and the Troy have given considerable space in their briefs to the question as to which of those two vessels was to be regarded as the one overtaking the other, with a view to claiming for their respective vessels the privilege given by rule 22 (Act Feb. 8, 1895, c. 64, 28 Stat. 649 [U. S. Comp. St. 1901, p. 2891]), to the one overtaken.  The claim of the Troy is that she passed the Wilbur while the latter was under check at Detroit, and thus gained the favored position.  For the Wilbur it is claimed that the Troy came up only to a position where she lapped the Wilbur, and did not deprive the Wilbur of the leading position.  We do not feel called upon to decide this question.  A disagreement over such a matter furnished no apology for engaging in a reckless contest in navigable waters, and putting others who were exercising their lawful rights therein to hazard and ultimate loss; nor did it give either the right to obstinately persist in a course which would bring the other into peril.

It remains to consider what judgment ought to be pronounced in regard to the Mariposa and the Martha.  If the testimony of the officers of these vessels is to be believed, there is no reasonable ground for thinking that either of them was at fault.  From that it would appear that, in coming down through the cut, they first met the Majestic, a steamer going up, and, turning to starboard, passed her by the port hand.  Thereupon they swerved back toward the range line, when, the signals for passing the steamers below having been given and answered, they again turned out to starboard, and proceeded on that course until they saw the vessels coming up abreast of each other, when the Mariposa ported again; the Martha following her.  The steamers passed the Mariposa safely, the Wilbur being rather close and already beginning to sheer.  Nothing could then be done.  Only the fraction of a minute elapsed after the Wilbur passed the Mariposa before the crash came.  Meantime the Martha, seeing the Wilbur coming, had vainly

ported again. The stem of the Wilbur stove in her port bow, and penetrated to the collision bulkhead. The distance from her bottom to the bed of the channel was only 2½ feet, and she sank on her fore foot immediately. The after part swung around somewhat to port, filled, and went down. The captain of the Martha did not pay attention to the range, but kept his vessel properly headed on his steamer. No fault can be found if he did as he says. For the Wilbur it is urged that he ought to have seen the sheer of the vessel earlier, and have taken measures to get out of the way. But the combined speed of the meeting vessels was 20 miles an hour. When the Wilbur was first perceptibly sheering off, she was probably not much, if any, more than 1,000 feet from the Martha. They would come together in from one-half to three-quarters of a minute. We do not think it would have been possible for the Martha to have escaped. Besides, the peril was extreme from the time the sheer became decisive; and we should think the indulgence due to his situation would excuse the master of the Martha, even if he did not do all that he might have done, or did not do it as quickly as he would but for the excitement of the moment. The Ohio, 91 Fed. 547, 33 C. C. A. 667; The Bywell Castle, 4 Prob. Div. 219; The Elizabeth Jones, 112 U. S. 514, 5 Sup. Ct. 468, 28 L. Ed. 812; The Maggie Smith, 123 U. S. 349, 8 Sup. Ct. 159, 31 L. Ed. 175.

The testimony of those navigating the Mariposa was given by those who were charged with that special duty, and they give the course, which they run with particular reference to the range lights which they say they all the while observed. It is a standard rule, approved by many decisions, that "more weight is to be given to witnesses who testify as to the movements of their own vessel than to witnesses on other moving vessels or onlookers." 7 Cyc. 397, tit. "Collisions," where numerous cases are cited. There is other testimony, however, to which we are referred, tending to a different conclusion in reference to some of the questions involved—mainly, however, to the question on which side of the channel the collision occurred. This testimony comes from those not on the Mariposa or the Martha, and who, from lack of observation or the opportunity of observation, testify from estimates made from their recollection of the situation. There is nothing based on certain data which conflicts with the testimony of the officers of the Mariposa. Moreover, the testimony of these latter, as respects the point now in question, is corroborated by the position in which the Martha was found by the wreckers, and this is shown beyond doubt to have been athwart the channel; her head lying 175 feet west of mid-channel, and her stern extending just over it. This was her position when she went down. When it is remembered that she was heavily laden, and the blow of the Wilbur was a violent and crushing one, we do not think it probable that she was carried by the shock very far out of her course. Both her captain and the watch testify that the bow of the Martha dropped instantly, and did not swing after the collision. These indications point to the conclusion that the fore end of the Martha sank quickly to the bottom, and that her stern was turned around to port on the pivot of her fore foot by the pressure of the current while her stern was sinking. If this conclusion is correct, the fair inference

is that the place where the vessels came together was as much as 150 feet to the westward of midchannel. The course taken by the Wilbur on turning around the lower light on her port side to go up the cut also tends to confirm the testimony from the Mariposa. As we gather from the testimony of those concerned with the navigation of the Wilbur, she passed about 40 feet distant, and then steadied to a bearing on the second red light on the eastern side of the channel, 1½ miles distant. As the collision happened only one-third of that distance up, it seems more than doubtful whether the Wilbur could have crossed the range line in the middle of the channel when she sheered off to the westward. If that be so, the whole departure of her sheer was in the western half of the channel, and locates the Mariposa and the Martha about where they say they were. And in the cross-libel of the Wilbur she avers that, as they were meeting the Mariposa, the Troy, "instead of checking or directing her course to starboard in accordance with the announced intention, kept her speed and held near the center of the cut." As the Wilbur was on the port side of the Troy, and 40 feet away, and her own width was 40 feet, and she passed the Mariposa 50 feet distant, the Mariposa having a breadth of beam of 40 feet, it would follow that the Mariposa's course was 150 feet to the westward of midchannel.

It is contended for the Wilbur that the Mariposa should have known that the Wilbur and the Troy were coming up abreast, and that they would need more ample room than she gave them. We think that she gave them ample room, whether she knew they were coming abreast or not. But we think, also, that there is no just ground for contending that while the steamers were below the cut the Mariposa should be expected to know that the steamers were coming abreast. The lights of other vessels were there. The Troy and the Wilbur had separated somewhat at that time, and there was nothing in the indication of their lights from which alone their position could be seen, which should warn the vessels above of any such intention. After they made the turn and began to come up, they could, we should suppose, be seen, and probably were, for the Mariposa ported again. All the while the latter vessel was entitled to suppose that, passing signals having been given and understood, the steamers would turn out when it should become necessary; and this expectation might justly last until it became evident they were not doing their duty. When this did become evident, the Mariposa could have done nothing to mend the situation. At the speed the steamers were going up, it was scarcely two minutes from the time they came around the lower light until they were passing the Mariposa. If the Troy had ported, as she should, there probably would have been no trouble. And as it was, it is very doubtful whether there would have been any collision if the master of the Wilbur had not incautiously checked his vessel, and thus subjected her to the influence by which she was turned off. Neither the Wilbur nor the Troy is privileged to charge it as the fault of the Mariposa that she relied on them to do their duty, so long as they did not clearly show that they did not intend to do it.

We observe that in a number of instances the district court, upon objection, excluded testimony tendered at the hearing (which was had

in open court) upon various grounds which were assigned by the court. In several of these instances we think the testimony tendered and rejected was material and competent. But it happens in this case we are able to form definite conclusions without the aid of that which was rejected, and that which was rejected was in support of these conclusions. We think, however, we should call attention to the error and inconvenience of this practice. If the court of first instance was empowered to make the ultimate judgment, there might be little or no objection to the course pursued. But as its determination is subject to appeal, and the appellate court might have a different opinion in regard to the competency and materiality of the rejected testimony, the difficulty becomes obvious. In such circumstances it might become necessary to undo all that had been done subsequent to the taking of the testimony and go over the ground again, and thus involve much cost and delay. The proper course is to receive the testimony tendered, subject to the objection, unless, indeed, it be so utterly irrelevant or immaterial that there could not possibly be any doubt about it. The power of the court to punish with the costs the bringing in of flagrantly indirect and useless testimony should ordinarily be a sufficient deterrent.

We think the district court was right in holding the Wilbur and discharging the Martha, but we cannot approve its decree in discharging the Troy and holding the Mariposa. We are very clear that the Wilbur and the Troy were the parties who should be held responsible for the disaster, and should be condemned to pay the damages. Upon the conclusions already stated, and the reasons given therefor, we think the Wilbur and the Troy should satisfy the damages of the former by equal contribution; the lien of the Wilbur to be subordinate to that of the owners of the Martha for her damage.

The decree of the district court, so far as concerns the responsibility of the Wilbur and the Martha, is affirmed as herein modified by the judgment against the Troy, with costs of both courts. So far as it concerns the responsibility of the Mariposa and the Troy, it is reversed, with directions to enter a decree charging the Wilbur and the Troy with the damages of the Martha and interest, and with the costs of both courts, to be collected one-half from the stipulators for each, with the proviso that, if such moiety cannot be collected from each, recourse may be had upon the other to the extent of its stipulation above the sum of such other's moiety of damage decreed against her, and charging the Troy, in favor of the Wilbur, with one-half the damages of the latter, with interest thereon; each of those parties to pay its own costs here and in the court below, the lien of the Wilbur to be subject to that in favor of the Martha upon the Troy for her damage, interest and costs, as herein decreed.

Following will be found the opinion of the court below:

SWAN, District Judge (orally). The three steamers which figure in this case are all charged with fault—the Wilbur, the Troy, and the Mariposa. So far as the Troy is concerned—for I will commence at the easiest end of the case—the situation is this: I find, as I stated during the argument, that the Troy passed the Wilbur when nearly abreast of Woodward avenue; that the Wilbur there renounced her priority of right, and made herself the overtaking vessel. I think that is the fair weight of the testimony. There is on this

point the usual conflict of evidence that attends admiralty cases, and would attend any case, whatever the subject-matter, where the witnesses must speak as to matters that are not plainly visible, not illuminated by daylight—the matters occurring in the dark; but I think that the Troy was thenceforth continuously ahead—at some times further ahead than others. If we throw out all the interested testimony in the case, it fairly appears in the testimony of the mail carriers—the two witnesses from the mailboat, whose names have escaped me—that the Troy had fairly cleared the Wilbur while the latter was waiting for the mail. That being the case, the Wilbur was to her an overtaking vessel. That continued to be the relation between them, and gave to their navigation the appearance of being engaged in a contest of speed. Both masters deny that their course up the river had any such character, and I must accept their denial, and believe they were going up there at their ordinary gait—12 or 13 miles an hour, though I think the man that was ahead was very glad to keep his position, and the man behind would have been glad to have exchanged with him. They proceeded upon the usual course, both of them being competent mariners, and I believe both mean to tell the truth—they proceeded upon the course which each regarded as safe. There was nothing to intimate danger to them, nothing to induce apprehension. They ran at a speed of 12 or 13 miles an hour, keeping safely away from each other and from other vessels, and navigating without incident until they had entered the mouth of the cut or dredged channel of Lake St. Clair, when they exchanged signals with the steamer Mariposa, which had the schooner Martha in tow, bound down. The Mariposa at that time was about midchannel, and I do not think changed that position. I think she came down with the usual inclination of a vessel having the ranges and being on the ranges to adhere to them. I won't use the term commonly applied to that navigation which monopolizes the ranges, because it is habitually done by most masters, often from timidity inspired by the size and draft of the vessels—a morbid fear of possibly grounding if on either hand of midchannel. The signals between the Mariposa, the Troy, and the E. P. Wilbur were seasonably exchanged. The mutual relations of the Troy and of the Wilbur continued safe as they went up the cut until just before they came abreast of the Mariposa. That is the testimony of Capt. Gillies. It is the testimony of Capt. Fuller. Neither of them saw any appearance of danger in the situation, and both approved its safety until just before the collision. Now, each vessel, there is no doubt, had a right to go up there just as fast as she could, provided she exercised that right with due regard to the interest and safety of others; and the vessel that was ahead had a right to keep ahead, if she could, providing, as I say, she exercised that right reasonably. Therefore the Troy is not censurable for keeping ahead, as she was safely away from the Mariposa and Martha. Nor is the Wilbur to be condemned for getting along as fast as she could, but, as she was the overtaking vessel, she was bound to exercise that right with much greater circumspection, so as not to approach too closely to the Troy, or bring herself within the operation of the latter's suction; and, if she did so, she must abide the consequences. She put herself voluntarily in that position. She could not lawfully attempt to pass the Troy without the latter's consent, for which she did not ask. According to the testimony, they were at a safe distance from each other, and there was no sign on the part of either boat that it was affected by the proximity of the other until they were getting nearly abreast of the Mariposa. Then it was seen by the master of the Wilbur that his vessel was dropping off to port and towards the course of the Mariposa. It then became his instant duty to check or drop behind the Troy. This he failed to do, but, in his efforts to avoid the Mariposa, drew in so closely to the Troy as to get within her suction, when, of course, and as was to be expected, the Wilbur sheered to port, and held her sheer until she struck the Mariposa's consort, the Martha. No fault can be imputed to the Troy. I think she was navigating properly, and I do not think Capt. Fuller's testimony—any reading of it—will condemn Capt. Gillies' conduct there. Capt. Fuller, as was pointed out in the argument, did not question that the Troy was as far east as she could go, and his judgment upon her course is confirmed by Mr. Montgomery, the lookout of the Wilbur. The witnesses on the Wilbur agree that the distance between the vessels was 75 or 100 feet, until they had proceeded up the cut

some distance, and pronounced that distance safe. When it was reduced to 30 or 40 feet or less by the approach of the Wilbur to the Troy, that was the voluntary act of the Wilbur, which the Troy could not prevent, and for the consequences of which she cannot be condemned. The Troy's witnesses testify that the steamers were much further apart coming up the cut, and when the Wilbur took her sheer; but as the duty of keeping clear was, by the White Law Rule 22, and pilot rule 6, wholly upon the Wilbur, and the Troy, clearly complied with those rules, the latter is faultless. The Troy neither attempted to cross the bow or crowd upon the course of the Wilbur, which took all the risks of her own course, and cannot ask the Troy to share its consequences with her.

No one who ever tried an admiralty case ever found that the witnesses on moving vessels, speaking of distances in the nighttime and of moving vessels, ever got within any reliable distance of anything. The Troy, I think, was safely over to the eastward, and when Capt. Gillies, of the Troy, was called upon by the master of the Wilbur to give him more room, he answered back: "I cannot. I am as far over as I can go." The Wilbur's master then said: "Why don't you check, then?" Capt. Gillies replied: "Why don't you check yourself?" or something of that kind. Capt. Fuller responded: "I have checked." Now, as I have said, Capt. Fuller voluntarily put himself in that situation. The checking of the Troy would not have helped the Wilbur at that time. Perhaps Capt. Fuller thought there was room enough between the Troy and the Mariposa, and rightly thought so, had it not been that he unguardedly brought his steamer within the Troy's suction. That was the springhead of this disaster. I think that at that time the Troy was nearer the distance stated by Capt. Gillies from the east bank than the witnesses for the Wilbur have put it, and I do so for these reasons: (1) Gillies was in a better position to estimate that distance than the master of the Wilbur, who admits that he could not. (2) According to the master of the Mariposa, he thought that the Wilbur was 75 feet away from him. Add to this estimate the Wilbur's beam, about 40 feet, and the distance between the Wilbur and the Troy, 35 to 40 feet, and the beam of the Troy, 45 feet, would put the Troy out about 150 or 165 feet from the Mariposa, upon the judgment of the witnesses on the part of the Mariposa and the Wilbur alone. The weight of the testimony satisfies me that the Troy was fully 250 feet away, at least, from the Mariposa. A nearer position is irreconcilable with admitted facts. (3) The misfortune in the case was the unfortunate move by the Wilbur, which caused her to sheer off. She went off very rapidly, and when she struck the Martha she did not expend all her energy in that blow. The proofs are clear that she struck the Martha, swung around simultaneously with the blow, which was delivered at a speed of 12 or 13 miles an hour, recoiled, and swung right across stream. The Troy passed her when she had recoiled across the channel. One of the witnesses says he could have jumped aboard the Troy from the Wilbur. Another says there was a distance of 40 feet there. I don't care which it is. It would show that the Troy was considerably further to the eastward when the Wilbur moved out from the Martha simultaneously with the impact than the hurried views of the witnesses on the moving Mariposa and the Wilbur estimated. The Wilbur is 290 feet long between perpendiculars, and probably 310 or 315 feet over all. If 250 feet of her length was across or nearly across the channel—if the Troy cleared her 10 feet when the Wilbur's bow lay on the Martha, or 40 feet, as the Troy's witnesses state— the Troy was about 300 feet to eastward of midchannel at the collision. She perhaps could have gone a little further to eastward, but that her master could not know. His judgment erred on the side of the safety of his own vessel, and cannot be impeached because the event showed he might have gone further. The Star of Hope, 9 Wall. 230, 19 L. Ed. 638; The City of Antwerp and The Friederick, L. R. 2 P. C. 25. Especially is this true in the sudden emergency created by the Wilbur's too close approach. It is incumbent upon the Wilbur to show that she was brought into contact with the Martha through no fault of her own. She is prima facie the wrongdoer. I don't think she has met that burden. She occupies the same position in this case as did the Santiago in the case preceding. Through misfortune or fault or the facts of the case, she is unable to meet that burden, and should be condemned.

The last question is one of more difficulty, and that is as to the Mariposa and the Martha. The misfortune fell upon the Martha. I think that the weight of the testimony shows that certainly the Martha was not further west than the range line at the time she was struck. She was about the center of the channel, and perhaps a little to the eastward of it. I think that her changed position and heading were produced by the energy of the blow with which the Wilbur hit her, which slued her around at that point. The Mariposa was responsible for her position, and ought to share the consequences of the collision. The two vessels which are to be condemned here are the Wilbur, as the first wrongdoer, and the Mariposa, as the second. The Troy is dismissed from the action, with costs.

Mr. Shaw: What does your honor do with the Martha?

The Court: The Martha was helpless. I think the damages should be divided between the Mariposa and the Wilbur—the Wilbur being chiefly in fault; but the Mariposa is blameworthy for not having taken timely and sufficient action to avoid the up-coming vessels and allow them room. There would have been no accident had it not been for the sheer of the Wilbur and her unfortunate navigation, and there probably would not have been any accident if the Mariposa had put her consort in the right place. The Mariposa did not follow her own signal, and, although she announced that she was directing her course to starboard, she did not, and therefore I think the damages should be divided between the Wilbur and the Mariposa.

While the navigation of steam vessels at high speed when approaching other vessels, or under conditions portending possible danger, cannot be too strongly reprobated, and not infrequently is ground of condemnation of both, when one only inflicts the injury, yet in this case the active and proximate instrument of wrong was the Wilbur, which voluntarily took upon herself the hazard of the known danger of too close proximity to the Troy, which, in the judgment of her master, was running as close to the there unmarked easterly boundary of the channel as was prudent—a judgment which is not even now questioned by the master of the Wilbur.

The master of the Troy had a right to navigate his vessel in the belief that the Wilbur would be properly and prudently navigated, and would not attempt to pass the Troy without the latter's consent, and, of course, that she would not draw into dangerous proximity. This fault the Wilbur recklessly committed at a time when no preventive measure could have been taken by the Troy, and the Wilbur therefore has no right to call upon the Troy for contribution.