WILMINGTON RY. BRIDGE CO. et al. v. FRANCO-OTTOMAN SHIPPING CO., Limited, et al.

THE CROMWELL.

(Circuit Court of Appeals, Fourth Circuit. January 7, 1919.)

No. 1637.

1. NAVIGABLE WATERS ⚙➩20(2)—BRIDGES—APPROVAL BY GOVERNMENT—OBSTRUCTION TO NAVIGATION.

The official approval by the government of the construction of a bridge is conclusive that the bridge was a lawful structure, though it interfered with navigation.

2. SHIPPING ⚙➩81(2)—INJURIES TO BRIDGE—DUTY OF VESSEL.

Where a bridge over a navigable river was a lawful structure, though it obstructed navigation, a vessel must approach it with reasonable skill and care to avoid injuring it, having in view the difficulty and peril occasioned by the bridge itself, but need not guarantee its safety.

**3.** SHIPPING ☞86(2)—INJURIES TO BRIDGE—PRESUMPTION OF NEGLIGENCE.

Where a moving vessel collided with a drawbridge, there is a presumption of negligence on the part of the vessel; but that presumption may be rebutted by proof that the course taken by the navigator in the emergency caused by the location of the bridge was prudent and skillful.

**4.** SHIPPING ☞86(2)—INJURY TO BRIDGE—NEGLIGENCE OF VESSEL.

Where a collision occurred between a vessel in tow of a tug and a drawbridge, which, though lawful, was constructed diagonally across the channel, so as to allow very little room for passing vessels, evidence *held* not to show that the vessel approached the bridge on a flood tide, or that it was negligent navigation of the vessel to attempt to turn to port, instead of immediately anchoring, after she began to sheer to starboard when passing close to shoals near the bridge, as she was compelled to do to pass through the draw.

**5.** SHIPPING ☞81(2)—INJURY TO BRIDGE—CARE REQUIRED.

In an emergency created by a sudden sheer of a vessel when approaching a drawbridge, navigator was responsible for reasonable care, not the highest degree of skill and care.

**6.** SHIPPING ☞81(1)—LIABILITY OF VESSEL—NEGLIGENCE OF PILOT.

A vessel is liable for the negligence of a mere pilot, even when employed under the compulsion of law.

**7.** TOWAGE ☞19—LIABILITY OF VESSEL—NEGLIGENCE OF CONTRACTOR.

Where a vessel had contracted with a towing company to be towed to dock, and at the time of a collision with a drawbridge was navigated by the master of the tugboat, whose orders were transferred to the crew by the vessel's master, negligence in navigation of the vessel was negligence of an independent contractor, for which the vessel is not liable.

Appeal from the District Court of the United States for the Eastern District of North Carolina, at Wilmington; Henry G. Connor, Judge.

Petition by the Franco-Ottoman Shipping Company, Limited, as owner of the steamship Cromwell, and others, against the Wilmington Railway Bridge Company and others, to limit liability for injuries to the bridge, caused by collision of the vessel with the bridge. Decree for petitioners (247 Fed. 207), and defendants appeal. Affirmed.

Thomas W. Davis and John D. Bellamy, both of Wilmington, N. C., for appellants.

J. O. Carr, of Wilmington, N. C., and J. Parker Kirlin, of New York City (John M. Woolsey, of New York City, and George Rountree, of Wilmington, N. C., on the brief), for appellees.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

WOODS, Circuit Judge. In the port of Wilmington, N. C., the Cromwell, a British vessel, on her passage up the Cape Fear river to the dock where she was to unload her cargo of pyrites, struck and injured the railroad bridge. Separate actions for damages were brought in the state court by the appellants, owners of the bridge, and attachments were issued. Thereafter the issue of negligence and the liability of the ship was transferred to the District Court of the United States under a petition for the limitation of liability. Richardson v. Harmon, 222 U. S. 96, 32 Sup. Ct. 27, 56 L. Ed. 110. The negligence charged was (a) attempting to put the ship through the draw on an upflowing tidal current in the narrow channel, which made the control of a vessel as large

as the Cromwell exceedingly difficult; (b) permitting the ship to sheer about 700 feet below the bridge, and failing to take measures to correct the sheer until the ship was within 60 or 70 feet of the bridge; (c) turning and holding the wheel hard to starboard, starting the engine astern, and throwing out the starboard anchor 60 or 70 feet from the bridge, when the ship was still sheering to starboard, and heading for a span of the bridge, thus it is alleged, turning the bow further to starboard and causing it to strike the bridge; (d) having an incompetent pilot and incompetent officers on deck and at the wheel.

The owners of the Cromwell denied negligence; alleged, if there was negligence in the navigation of the ship, it was that of the Diamond Steamboat & Wrecking Company, owner of the tug Gladiator, employed as an independent contractor to take the ship up the river to its dock; and charged that the collision was due to negligence in constructing the bridge obliquely across the channel and with such a narrow draw that it was an unlawful obstruction to navigation.

The District Court held that no negligence in the navigation of the ship had been proved, and that, even if there was negligence, it was that of the Towing Company, of which the Wilmington Towing Company is successor, as an independent contractor.

[1] Official records and the testimony of the engineer leave no room to doubt that the bridge was constructed and maintained according to the government's requirements. This official approval is conclusive that the bridge was a lawful structure, though it interfered with navigation. Miller v. Mayor of N. Y., 109 U. S. 385, 3 Sup. Ct. 228, 27 L. Ed. 971. If, therefore, the ship had been injured by the bridge, it would have had no right of action.

[2] It follows that a vessel, in passing through the draw of such a bridge, is burdened with the obligation to recognize it as a legal structure, to take notice of the extent to which it obstructs navigation, and use reasonable skill and care to avoid injuring it, having in view the difficulty and peril, although the difficulty and peril be created by the bridge itself. Due care in such case is the care which the unusual and difficult conditions suggest as reasonable. But the bridge owners cannot lay upon the ship a duty to guarantee safety against every possible peril and difficulty which their own obstruction to navigation had brought about.

[3] On the issue of negligence the bridge owners have in their favor the presumption that a moving vessel is negligent in colliding with a vessel at anchor or a dock or bridge properly constructed. The Virginia Ehrman and the Agnese, 97 U. S. 309–317, 24 L. Ed. 890; Inland & Seaboard C. Co. v. Tolson, 139 U. S. 551, 11 Sup. Ct. 653, 35 L. Ed. 270; The W. G. Mason, 142 Fed. 913–915, 74 C. C. A. 83; Minnesota S. S. Co. v. Lehigh Valley Transportation Co., 129 Fed. 22–33, 63 C. C. A. 672. But this presumption of negligence by the moving ship may be rebutted by proof that the location of the stationary vessel, the obstruction of navigation by the bridge, or other causes had brought the moving vessel into an emergency not to be reasonably foreseen, and that the course taken by the navigator in the emergency was such as might well have been taken by a prudent and skillful navigator.

[4] These facts are not in dispute: The Cromwell was 312 feet long, 43 feet wide, 21.10 feet deep, 3,086 tons gross, 1,877 tons net, register, drawing at the time of the collision 16 feet of water. The agent of the Cromwell employed the tug Gladiator, owned by the Diamond Steamboat & Wrecking Company to tow the ship up the river through the draw of the railroad bridge to the Swift Fertilizer Works. Although the draw of the bridge had been approved by the government engineers as a lawful structure, the bridge crossed the river diagonally, and only 61 feet of open way was left for the passage of vessels. This construction and the limited space, together with the presence of shoals in the river, made the towing of vessels through the draw a task so difficult and perilous that it was the subject of much anxiety and complaint by all pilots and persons concerned in the commerce of the port. The main peril to be guarded against was the sheering of the ship on its near approach to the lower shoal necessary to the passage. The Diamond Company was a local company of good reputation, and Sanders, who directed the movements of the tug Gladiator was an experienced officer and pilot, who had taken a number of other vessels through the draw. The master of the Cromwell had no knowledge of the river, and relied entirely on Sanders to navigate tug and tow. The pilots of the port used two methods in towing large vessels through the draw: Some pulled the tow through by a hawser attached to the tug; others used what they thought the safer method of lashing the tug to the vessel and at a certain point releasing the vessel while in motion, thus "kicking" it through. But there was no consensus of opinion that the former method was less safe than the latter, nor do the facts justify such a conclusion.

A number of large vessels had been safely taken through the draw without striking the bridge; but on several occasions vessels in charge of experienced pilots had sheered and struck the bridge without material injury.

The care necessary in taking the Cromwell through was fully appreciated, and precautions had been taken for prompt action in controlling her movement. Sanders, who directed the actions to be taken on both vessels, was on the bridge of the Cromwell. Wicklen, master of the Cromwell, was by his side, conveying his orders to the engineer and helmsman of the Cromwell, both of whom were at their posts. Sellars, an experienced tug master, was on the tug, obeying the orders of Sanders. Knowing that due care required the movement to be made at high-water slack, Sanders and Sellars had the night before ascertained the time of high tide from the almanac used as authority, and timed the movement so as to reach the draw about an hour later, when the tide would be high-water slack—that is, at the flood, either stationary or flowing slightly seaward against the vessel. Tug and tow approached the draw, going at the cautious speed of a half mile to a mile an hour.

Thus the undisputed facts show due care at least to a point 700 feet from the draw. The charge of negligence then turns on the question whether at that critical point vigilance and apparent efficiency were relaxed into negligence and incompetency. In answering this inquiry, it must be borne in mind that, although the bridge was a lawful ob-

struction to navigation, the owners of the bridge, in making the charge of negligence, are burdened with the fact that they had chosen in its construction to leave little, if any, of that margin of safety which experience shows to be requisite to the avoidance of disaster, even when due care is exercised.

The first charge of negligence in attempting to go through the draw while the tide was running up, we think, was not established. The almanac generally relied on by navigators indicated that the tide would be high slack. The evidence is conflicting as to whether on the surface the tide was still running upward. Sellars, the tug master, testified that he saw by observation that the tide was dropping. But, even if it was still upward on the surface, the evidence and common experience show that this condition continues after the undertow has set outward against the incoming vessel.

The claimants alleged, and introduced testimony tending to prove, that the sheer occurred about 700 feet from the bridge, and that there was time and space enough to enable the navigators to correct it by the exercise of due care and skill. The testimony on behalf of the vessel was that the sheer occurred about 500 feet from the draw, and that in this emergency the navigators did all that they could to right the ship and prevent the collision. On this issue it appears clearly from the evidence that, in approaching the draw, a large vessel must necessarily go very near to the shoals on the west side of the river, and that sometimes, even with careful and skillful navigation, it will get into water shallow enough to make the ship sheer to starboard. This was what happened to the Cromwell, and we are unable to find any evidence that it was due to negligent navigation rather than the intrinsic peril of navigating in such conditions. With the occurrence of the sheer arises the difficulty of correcting it in time to avoid striking the bridge.

In this instance, when the sheer occurred, the tug was pulling with the hawser taut. The Cromwell had steam up, with her propeller either still or in very slow forward movement. To correct the sheer of the ship to starboard, Sanders ordered the tug to port and the wheel of the Cromwell hard to starboard. These orders would ordinarily result in porting the ship, thus correcting the sheer to starboard; but, on account of the slow movement of the vessel, these measures did not sufficiently correct the sheer. When this failure became evident, Sanders ordered the Cromwell full speed astern, the anchors dropped, and the tug to cease pulling. These orders were carried out promptly, except that only one of the four anchors was dropped. The headway of the ship was not sufficiently arrested to avoid striking the bridge.

[5] There was a difference of opinion among navigators as to the proper course to pursue when the sheer occurred. It might have been most prudent to attempt to stop the ship by reversing the engine and dropping all anchors as soon as the sheer occurred; but it was not shown to be unreasonable to expect to correct the sheer to starboard by using both the tug and the wheel to port the ship. There was some testimony to the effect that Sanders should have ordered the ship full speed ahead. But, on the other hand, there was abundant evidence that he gave the only proper orders; and in the emergency he was responsi-

ble for reasonable, not the highest degree of, skill and care. The Ludvig Holberg, 157 U. S. 68–72, 15 Sup. Ct. 477, 39 L. Ed. 620.

While the question of negligence is not free from difficulty, we think the finding of the District Court that the tug and vessel were managed by a capable and experienced navigator with reasonable care and skill under the circumstances is well sustained by the evidence.

[6] Even if there was negligence, however, there can be no doubt that it was that of Sanders, the navigator of both vessels. Had the ship employed Sanders as a mere pilot, even under the compulsion of law, it would be liable for his negligence. The China, 7 Wall. 53, 19 L. Ed. 67; De Lima v. Bidwell, 182 U. S. 1, 21 Sup. Ct. 743, 45 L. Ed. 1041.

[7] But the evidence of Henry Whyte shows clearly that Sanders was not a mere pilot of the Cromwell, but was the commander of the tug Gladiator, under the authority of its owners, who had contracted that the tug should tow the Cromwell up the river to the draw where it was to unload. Whyte was the local agent of the Seaboard Air Line Railway Company, one of the appellants, and also the agent and consignee of the Cromwell. He testified that he—

"paid the tugboat $40 to take it to the Seaboard terminals, and $100 for taking it up to Swift's factory and return from the factory to the terminals; total, $140."

The money was paid to McGirt, the agent of Diamond Steamboat & Wrecking Company, who testified that he received it from Whyte as agent for the steamship for towing her to the Seaboard terminal and thence up the river and through the bridge to the Swift Fertilizer Factory and back, and that he turned over to Sanders his portion of it as the representative of the Gladiator. The owners of the tug having thus entered into an independent contract of towing, the tug alone would be responsible for negligence in the undertaking, unless officers of the Cromwell retained some control of the ship and were guilty of some negligence. It is true her master and crew were on the Cromwell, carrying out the orders of Sanders, but they did nothing more, and in that relation they were mere instrumentalities or means used by Sanders to apply the wheel, engine, and other instruments of navigation—not participants in the navigation. Hence it seems evident that, if the injury to bridge was due to negligence, it was that of the towing company, owner of the tug, as an independent contractor, for which the Cromwell was not responsible. Sturgis v. Boyer et al., 24 How. 110, 16 L. Ed. 591; The Eugene F. Moran, 212 U. S. 466, 29 Sup. Ct. 339, 53 L. Ed. 600.

Affirmed.