COASTWISE S. S. CO. v. ÆTNA INS. CO.   SAME v. HOME INS. CO.
SAME v. ST. PAUL FIRE & MARINE INS. CO.   SAME v. PROVI-
DENCE–WASHINGTON INS. CO.

(District Court, S. D. New York.   March 27, 1908.)

INSURANCE—MARINE INSURANCE—COLLISION CLAUSE IN POLICY.

A running-down or collision clause in a marine policy of insurance on a vessel, providing that the insurer will indemnify the assured "if the vessel hereby insured shall come in collision with another vessel and the assured become liable to pay and shall pay, any sum or sums for damages resulting therefrom to said other vessel," applies only where there is an actual contact between the insured vessel and another, and the insurer is not liable in case of a collision between a tow of the insured vessel and another, although the insured vessel may have been subjected to liability for such collision.

In Admiralty.   Actions on marine insurance policies.

Butler, Notman & Mynderse, for libellant.

John F. Foley, for Ætna Insurance Company.

Robinson, Biddle & Ward, Roderick Terry, Jr., and W. S. Montgomery, for Home Insurance Company.

James J. Macklin, for Providence-Washington Insurance Company.

ADAMS, District Judge.   These actions were brought by the Coastwise Steamship Company, and its trustees under a dissolution of the corporation, the owner of the tug Richmond, against the Ætna Insurance Company, the Home Insurance Company, the St. Paul Fire & Marine Insurance Company and the Providence-Washington Insurance Company to recover the proportion of losses alleged to be due from the underwriters by reason of a collision between the yacht Elsa and the barge Georgia, in tow on the port side of the Richmond, on the 31st of July, 1901.

The collision happened as stated in the decision of the case reported under the name of The Richmond (D. C.) 124 Fed. 993, wherein both vessels were held in fault.   It was described as follows:

"These actions arose out of a collision which occurred on the Brooklyn side of the East River, a short distance above the Brooklyn Bridge, about 3 o'clock p. m. July 31, 1901, between the steam yacht Elsa, owned by E. R. Dick, and the barge Georgia, in tow of the tug Richmond, on the tug's port side.   The barge and tug were owned by the Coastwise Steamship Company. The yacht was bound down the river, intending to go through the Buttermilk Channel, and the Richmond and the barge, the latter laden with about 3,000 tons of coal, were bound east.   The tide was flood and it was a clear bright day.   The yacht was going at the rate of about 7 miles per hour and the tug and barge, aided by the tide, about 5 miles.   The Elsa was very slightly to the starboard of the tug and barge, but they were practically head and head and there was risk of collision if both vessels kept their courses.   When they were less than a quarter of a mile apart, the yacht blew a signal of two whistles to the tug and starboarded her helm.   The signal was not heard on the tug and two or more blast signals were blown by the yacht to her.   One of these two, probably the first, was answered with a similar signal by the tug and she starboarded her helm and directed the barge to do likewise.   The barge was large and unwieldy and did not respond quickly to the helm and such effect as it would have had was counteracted by the reversing of the tug's screw, which was ordered when a collision was imminent.   The collision,

however, could not be avoided and the barge's starboard bow, which projected ahead of the tug about 75 feet, came in contact with the yacht's starboard side, abaft amidships, and some injury was done to both vessels."

Thereafter, the damages were paid in conformity with the decision, and the Richmond seeks to recover for her collision loss under the policies in suit. They were the ordinary form of hull time policies, running from a year from January 23, 1901, and provided that the risks designed to be covered were those of the adventures and perils of the harbors, bays, sounds, &c., of inland waters between Norfolk, Virginia, and Eastport, Maine. The policies had riders attached, which contained the following:

### "Collision Clause.

And it is further agreed, that if the vessel hereby insured shall come in collision with another vessel, and the assured become liable to pay, and shall pay, any sum or sums for damages resulting therefrom to said other vessel, her freight or her cargo, in such case this Company will contribute towards the payment of three-fourths part of the total amount of said damages, in the proportion that the sum insured under this policy bears to the total valuation of the vessel as stated herein, provided, that this Company shall not in any event be held liable under this agreement for a greater sum than three-fourths part of the amount insured under this policy.

And it is also agreed that this Insurance Company will bear a like proportionate share of any costs and expenses that may be incurred in contesting the liability resulting from said collision, provided, the written consent of the Company to such contest be first obtained."

The Georgia was free from fault and the issue presented here is as to whether the wording of the policy protects the assured with respect to a collision in which the vessel insured (the Richmond) has been involved, but where the actual contact was with a vessel not mentioned in the policy but lashed alongside of the insured vessel, where the owner thereof has paid, or become liable to pay, for the damages caused by the collision.

The libellant contends: (1) that the language of the policy does not require actual physical contact with the insured vessel in order to entitle her to come within the protection of the collision clause, (2) that the question has already been decided favorably to the libellant by this court and the English court of highest authority, (3) that the decision of this court should be in harmony with the established law in England, (4) that the parties contracted upon the basis of the rule in The Niobe Case, (5) that two of the defendants were liable for a share of the expenses of the litigation in the Richmond-Elsa collision case, (6) that the actions were brought in due season, and (7) that doubts, if any, should be resolved in favor of the libellant. The cases mentioned under the second point were the Western Transit Co. v. Brown (D. C.) 152 Fed. 476; The Niobe, 7 Asp. M. C. N. S. 89.

The respondents' points are: (1) The action was not brought in time, (2) the loss here sought to be recovered does not come within the terms of the policy, the only foundation for the libellant's claim being the case of The Niobe, and a dictum by Judge Hough in the Western Transit Co. v. Brown, based upon the theory that a tug and tow are one vessel, (3) that the ordinary meaning of the word "collision" is

the "act of colliding; a striking together; a violent contact," (4) that if there is any ambiguity as to the meaning of the clause, it should be interpreted with regard to the intention of the parties.

In Western Transit Co. v. Brown, the libellant, the owner of the steamer Troy, sought to recover the damages paid in consequence of a decision adjudging her partly in fault. Minnesota S. S. Co. v. Lehigh Valley Transportation Co., 129 Fed. 22, 63 C. C. A. 672. The action came on for hearing before Judge Hough, and he held that the libel should be dismissed, but used some language, in connection with the Niobe Case, very favorable to the libellant's contention here. When his decision was considered on appeal, decided March 10, 1908 (161 Fed. 869), the court arrived at the same result, but without approval of the language. It was said by Ward, J., speaking for the court:

"The policy of insurance contains a running-down clause, the material portion of which is as follows:

'And it is further agreed that if the ship hereby insured shall come into collision with any other ship or vessel or raft, and the assured shall in consequence thereof become liable to pay, and shall pay, by way of damages to any other person or persons, any sum or sums not exceeding in respect of any one such collision the value of the ship hereby assured, we, the assurers, will pay the assured such proportion of such sum or sums so paid as our subscription hereto bear to the value of the ship hereby assured.'

Colloquially we speak of a ship as being insured against damage by collision, but what we mean is that her owner is insured against loss arising from damage to his ship caused by collision. This peril was covered by the ordinary marine policy. When it was desired to protect the owner against loss because of his liability for damage caused by his own ship to another ship, the running-down clause was inserted in the ordinary policy. The extent of the underwriters' liability under that clause depends upon its construction, i. e. upon what the parties intended to cover by it.

In respect of his legal liability as a wrongdoer, no doubt one is as responsible for striking another with a club in his hand or with a bullet from his gun as for striking him with his fist. So also in respect to legal liability under the rules of navigation or in proceedings to limit liability, or under the doctrine of principal and agent, two vessels may be regarded as one. But these principles of law do not depend upon contract, and do not necessarily apply to a contract of indemnity. Whether they apply, and, if so, how far they apply to the running-down clause in a marine policy depends upon the intention of the parties to the contract.

They might have intended to protect the owner against loss because of liability to third parties caused in any way by his ship; or they might have intended to protect the owner in all cases where there was a contact between his ship and the other ship, either direct or by means of a physical connection; or they might have intended to protect the owner only when his ship actually herself came into contact with the injured ship.

Presumably the premiums charged would diminish as the risks were diminished.

We entirely approve of the language of Lord Bramwell in his dissenting opinion in the case of The Niobe, reported as M'Cowan v. Baine (App. Cas. 1891, 401), which was a suit on this very clause:

'I say then, in very fact, the Niobe did not come into collision with the Valetta, causing a liability in the appellant, and, according to the ordinary primary meaning of the words used the case is not within them. This is agreed. But it is said that for some reason the primary and natural meaning of the words is to be extended; and that we should hold that there was a collision where there was none. I am at a loss to see why. I think an Act of Parliament, an agreement, or other authoritative document, ought never to be dealt with in this way, unless for a cause amounting to a necessity, or approaching to it. It is to be remembered that the authors of the document

could always have put in the necessary words if they had thought fit. If they did not it was either they thought of the matter and would not, or because they did not think of the matter. In neither case ought the Court to do it. In the first case, it would be to make a provision opposed to the intention of the framers of the document; in the other case, to make a provision not in the contemplation of those framers.'

If it be supposed that the parties to this policy intended the running-down clause, as in the case first put, to cover any loss the assured sustained because of damage caused by his vessel to another vessel, then of course the libellant should recover the amount it has paid.

If they intended, as in the second case supposed, to cover any loss caused by damage done either directly or by means of intermediate physical connection, the libellant ought likewise to recover. The Troy caused the Wilbur to sheer into the schooner by sucking the water between her stern and the stern of the Wilbur into her own wake, and we think her owners are as much responsible for this as if she had pulled the Wilbur's stern over by a hawser or, by contact with an intervening vessel, had pushed her bodily over. The connection of water between the Troy and the Wilbur, though not so obvious, is equally a physical connection.

We think the language of the clause means that the vessel of the assured shall herself come into contact with the injured vessel, and as the Troy did not come into contact with the Martha, the decree of the court below is affirmed with costs."

The language of the clause in the insurance policy there was substantially like that contained in the one in question here, and the decision seems determinative of the controversy, but it is proper to say that if the libellant here had desired to secure the kind of indemnity it urges it is entitled to, it could have done so by the payment of an additional premium, when a policy would have been issued to cover the loss. Such a policy, known as a Stranding and collision policy, or Tower's liability policy, which contains the words "and or her tow," would have met with the libellant's desires.

In view of the conclusion reached that there can be no recovery under the policies, it is not necessary to consider the question of the time of the commencement of the action or the other matters discussed.

Libels dismissed.