NICHOLAS TRANSIT CO. v. PITTSBURGH S. S. CO.

(District Court, W. D. New York. April 20, 1912.)

1. COLLISION (§ 41*)—SHEERING OF VESSEL—BURDEN OF PROOF.
    A vessel which sheers from her proper course without apparent cause, and comes into collision with a meeting vessel, is presumptively in fault, and has the burden of proof to exonerate herself.
    [Ed. Note.—For other cases, see Collision, Cent. Dig. § 41; Dec. Dig. § 41.*]

2. COLLISION (§ 42*)—VESSELS MEETING—CARE IN NAVIGATION.
    A steamer passing up with a tow on a hawser *held* not in fault for entering the St. Clair Ship Canal, which is 294 feet wide and less than 1½ miles long, although another vessel had entered it coming down and a dredge occupied 75 feet of the east side, the weather conditions not being such as to apparently render such action dangerous.
    [Ed. Note.—For other cases, see Collision, Cent. Dig. § 42; Dec. Dig. § 42.*]

3. COLLISION (§ 42*)—STEAMERS MEETING IN SHIP CANAL—SHEERING OF VESSEL.
    A collision in the St. Clair Ship Canal between the steamer Glidden passing down and the barge Magna in tow of the steamer Empire City passing up *held*, under the evidence, due solely to the sheering of the Glidden without any fault on the part of either of the other vessels, which rendered them liable for her injury.
    [Ed. Note.—For other cases, see Collision, Cent. Dig. § 42; Dec. Dig. § 42.*
    Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

In Admiralty. Suit by the Nicholas Transit Company, as owner of the steamer John N. Glidden, against the Pittsburgh Steamship Company, as owner of the steamer Empire City and the barge Magna. Decree for respondent.

Goulder, Holding & Masten (Harvey D. Goulder and Frank S. Masten, of counsel), for libelant.

Hoyt, Dustin & Kelley (Hermon A. Kelley and G. W. Cottrell, of counsel), for respondent.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

HAZEL, District Judge. On October 9, 1903, at about 9:30 o'clock in the forenoon, a collision occurred in the St. Clair Ship Canal between the steamer John N. Glidden, owned by the libelant, the Nicholas Transit Company, and the tow barge Magna, which was in tow of the steamer Empire City, both owned by the respondent, the Pittsburgh Steamship Company. The St. Clair Ship Canal, with a current of 2 or 3 miles an hour, runs in a northeasterly and southwesterly direction, is about 7,300 feet long, 294 feet wide, and has on each side solidly constructed dikes or piers. On the day of the collision there was a breeze of 20 miles an hour blowing across the canal. A pile driver was afloat about 1,200 feet above the entrance to the canal, moored with her stern projecting at right angles into the channel for a distance of 75 feet. The steamer Empire City, up-bound, was without cargo. She had the Magna, also without cargo, in tow on a hawser of 600 feet, and proceeded through the water at between 7 and 8 miles an hour. By the government rules the speed limit for navigating the St. Clair Ship Canal is 8 miles an hour. The dimensions of the Empire City and barge Magna were as follows: The steamer, 406 feet long; beam, 48 feet; depth, 24 feet; and gross tonnage, 4,118; the barge, built of steel, 352 feet long; beam, 44 feet; depth, 22 feet; with tonnage, 3,259 gross. The Glidden was down-bound laden with iron ore, and her dimensions were length, 222 feet; beam, 35 feet; tonnage, 1,322 gross. She was the first of the said boats to enter the canal, and proceeded at the rate of about 5½ miles an hour, and, when about midway the length of the canal, the tow and steamer entered the opposite entrance holding up towards the west pier on account of the wind. Just before entering the canal, the tow passed the steamer W. D. Rees, down-bound, under a one-blast signal, and then, as she entered the cut, answered with an assenting signal of one blast the initial signal of the Glidden. Prior thereto she had blown an alarm or danger signal, which was later repeated, to those aboard the pile driver to swing alongside the east pier, and allow additional room for passing. These signals were thoroughly understood by the Glidden, and there was no confusion or misapprehension therefrom. There was sufficient space for safe passing even though the pile driver did not swing around; still, as the Empire City was incumbered with tow, there was a possibility, in view of the wind, that the barge would sag over and damage the driver. Hence the signals from the up-bound steamer to shift the driver around, which signals, however, were ignored by those in charge of the driver. The Empire City continued in her course a little to the windward, and, according to the proofs, passed the pile driver within 10 feet.

When the Glidden was between about 300 and 400 feet from the bow of the Empire City, several witnesses aboard the latter vessel, including the master, noticed what the Glidden frankly concedes, namely, that she first veered to the westward, and then sheered or dropped over toward the Empire City. It was thought by the master of the Empire City that the Glidden had "smelled" the west bank, and that that was responsible for her altered course to port, which, in the estimation of witnesses for the respondent, approximated a

point. The Glidden continued to edge over to port, and, while her bow was approximately 200 feet distant, the master of the Empire City, to make sure of clearing the pile driver, ported to swing a trifle to westward; then, having accomplished his intention, he quickly starboarded to avoid the Glidden which was still edging over, and checked speed to swing the stern of the Empire City away from a threatened collision. He testified that the Glidden escaped striking the Empire City's port quarter by about 25 feet; that she then started to swing rapidly to port as her bow came abreast the Empire City's stern; that she struck the hawser about midway between the tow, and slid along and struck the barge Magna's stem, with the result that the Glidden's starboard bow was crushed off from forward to aft, and that the towline was released on the steamer at about the time of collision. The evidence shows that the barge pulled the Glidden up the canal, forced her stern against the west pier while her bow swung towards the east pier, and she sank athwartship the channel at about 700 feet from the lower entrance to the dike.

The principal charges of fault against the Empire City are (1) that her speed was improper, in that it exceeded the rate specified in the government rules; (2) that she did not with promptitude release the towline; and (3) that she did not remain outside the canal to avoid passing the Glidden abreast the pile driver. The principal charges of fault against the barge Magna are (1) that she was too far over to the west of the channel; (2) that, though she had ample space to keep over to the westward, she failed to do so.

It is argued that the Empire City by her negligent navigation caused or contributed to the collision, in that she ported and swung to the east towards the Glidden to avoid the pile driver, a movement which caused the master of the Glidden, who saw that the steamers were passing each other perilously close in the vicinity of the pile driver, to put the Glidden's wheel hard a port, and that, when the Empire City starboarded, owing to her proximity and speed, she drew the Glidden towards her, and off her course.

It is conceded on all sides that the Glidden's sheer caused the collision, and the principal question seems to be whether the resultant consequences are attributable to the negligent maneuvering of the Empire City in her effort to avoid the pile driver, or to the fault of the barge in getting in the path of the Glidden. The evidence as to distances, the extent of the sheer, and the crowding to westward of the barge is conflicting, and, as usual in such cases, is difficult to harmonize; but by a consideration of the probabilities and circumstances the true situation has I think been fairly ascertained. Libelant's evidence tends to show that immediately after the initial sheer of the Glidden she completely recovered and straightened up; but that later on, when her bow was abreast the Empire City's stern, she came within the influence of the latter's stern suction, and, though every effort was made to avoid a collision with the barge by proceeding under a hard port wheel and backing, she was unable to recover from the sheer because the Magna, which was "close in westerly and holding up to the west, but beginning to swing down, came into their starboard bow, and both bows swung towards the center of the

canal." Whether the barge was over to the westward of the middle of the channel, and whether she contributed to the collision are questions of which I shall speak hereafter. The evidence indicates that no real danger was apprehended on account of the Glidden's sheer until she cleared the stern of the Empire City, at least such was the opinion of Capt. Humble, who believed that the Glidden would straighten up; while Capt. Smith of the Glidden, fearing collision from the time his steamboat began to sheer, before the bows of the vessels were abreast, instructed the watchman to call on deck the men below.

As I view the evidence, the speed of the tow was not excessive. The estimates of Capt. Smith and Engineer Lumby of the Glidden that her speed was approximately 10 miles an hour—"pretty nearly full speed" and "coming pretty fast"—are not as reliable as that of the witnesses on board the Empire City, who have testified that her speed did not exceed 8 miles an hour. Of course, if by proceeding more slowly she could with safety to herself have avoided the collision, it was her duty to do so; but, as she was with tow, her entry into the canal between the piers did not make it wholly safe to proceed on her lower check. According to the proofs, it was necessary to hold up the barge to keep her from sagging toward the east pier, and this could not have been done had she navigated much slower than the speed permitted by the government regulations.

Nor is the contention that the Empire City crowded the Glidden supported by the evidence. The burden of proof is upon the libelant to establish the negligence of the steamer and tow. There was enough room for the steamers, properly navigated, to safely pass each other without collision. The towing steamer entered the cut to the eastward of the center of the canal, and continued along perhaps closer to the middle then she would have done were it not for the pile driver. Taking into consideration that the stern of the driver projected 75 feet into the channel, and that there was a distance of 10 feet between the Empire City and the end of the driver and her beam, the Glidden still had fully 161 feet, more than half the entire width of the canal, in which to navigate and effectuate safe passing. There is no satisfactory evidence to show that the Empire City at any time navigated to the westward of the middle of the channel. According to Benham, master of the steamer Rees, a disinterested witness, no part of her went to westward of the middle of the channel, although he said that she "was just about the center of the canal for most of the distance." The testimony of the master of the Empire City and her crew in relation to her course is that she was just a trifle to the eastward of the center of the canal. Dwyer, foreman of the pile driver, however, testified that the Empire City passed the pile driver 20 or 25 feet away, but in his written statement to proctors for respondent, made a short time after the collision, he stated that the distance was about 10 feet. The towing steamer scarcely could have passed at her speed closer than 10 feet to the pile driver with reasonable safety to herself. But even assuming that, when the bows of the passing steamers came abreast, the suction of the more powerful steamer augmented the Glidden's sheer, I am still unable

to find any fault due to improper navigation by the Empire City. She did nothing out of the ordinary to cause the descending steamer to drop out of her course, and, as already stated, there was enough space to enable her to escape the forces or subtleties of suction.

[1] The probabilities from the circumstances all point to a gradual sheering towards the eastward which was augmented on coming alongside the stern of the Empire City. In such a situation the towing steamer was not in fault, but the Glidden was bound to exonerate herself, and the presumption is that she is to blame for her sudden sheer out of her course. Minnesota S. S. Co. v. Lehigh Valley Transportation Co., 129 Fed. 22, 63 C. C. A. 672; The Australia, 120 Fed. 220, 56 C. C. A. 568. As bearing upon her predilection to sheer, there is evidence by several reliable witnesses that the Glidden was difficult to steer, and had on previous occasions, in rivers 'when there was no other vessel around to affect her movements, sheered as much as two points. She was often so erratic in her navigation that the claim of the respondent that the effect of her propinquity to the west bank explains her conduct which resulted in the disaster is not wholly without reason.

[2] Libelant further contends that the Empire City was negligent in entering the canal; that, knowing of the presence of the pile driver, she should have stopped to allow the barge to anchor or tail off. With this contention I am unable to agree. While it is doubtless the rule that if the situation, because of wind and weather, were such as to make it obviously dangerous to the Glidden for the tow to pass through the canal in view of the position of the pile driver, then it was her duty to remain away or to keep a sufficient distance from the descending steamer to avoid injuring her. But this rule has no application to the elicited facts and circumstances. The St. Clair Ship Canal is less than a mile and a half in length, and vessels are almost constantly passing through with the wind blowing across the canal at as great a rate as on the day of the collision; and, had the tow waited for the Glidden to pass down, it is not unlikely that she would have had to delay for other vessels navigating in the same direction.

[3] In contradiction of the contention that the towline was not released with promptitude, it appears by the evidence that the hawser was let go on the steamer as rapidly as possible. True, there was no one stationed aft to release it, but on the instant Capt. Humble saw that the Glidden failed to straighten up as he expected she would do he ordered the towline released, and such direction was obeyed with commendable alacrity.

The next question is whether the barge was to the westward of the middle of the canal, and failed to duly port to keep over to the eastward. It is not shown that she was at fault for crowding or using more space than she was entitled to use. On the contrary, there is much evidence to persuasively show that she, in fact, was over to eastward of midchannel. True enough, when she first entered between the piers, her bow was a little to the westward of the middle of the canal, and her stern sagged off to leeward, but she straightened up, and did not again veer over westward of the center of the canal

before the collision. She was parallel to the piers when the Glidden was alongside the stern of the Empire City, and she was then about 60 feet from the east pier. Her master in describing the accident testified that, when he saw the Glidden sheer into the towline, he immediately slacked it, quickly turning the wheel to starboard, and then to hard aport, in his efforts to prevent the collision, which, however, it was impossible to avoid. The witnesses for respondent, Johnson, Olsen, Humble, and Brown, testified in substance that the barge, in the position in which she was just before the collision, could not have cleared the pile driver, which brought her to about 70 or 75 feet from the east pier. Opposed to such testimony, Haskell, wheelsman of the Glidden, swore that at the time of the collision the Magna was headed to the westward, that she dropped off a little, and that the vessels collided a little to the westward of the center of the channel. Taking into consideration the probabilities arising from the location of the vessels, when the accident occurred, I think it has been proven that the Magna was to the eastward of midway of the channel, and did not by negligent navigation contribute to the mishap.

In conclusion, I may state that, if it were necessary to determine herein that the Glidden by reason of her sheer was at fault for injuries sustained by the Magna, I should hesitate to so determine. It is evident that after her initial sheer Capt. Smith, perceiving that the Empire City held up slightly to the westward to avoid striking the pile driver, deemed it prudent to navigate somewhat closer to the east bank, and it is not improbable that this was the cause of her deviation to port. Therefore I am disinclined to believe that had she been navigated differently the collision would not have ensued. Her master was not required to exercise the greatest degree of care and caution, and the evidence shows that he used such care and nautical skill as the situation demanded. But the question of inevitable accident loses its importance in view of libelant's failure to prove that either the Empire City or the barge Magna were negligently navigated, or that the collision occurred by reason of their contributory negligence.

Decree for respondents dismissing libel, with costs.